IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| BEN BAKER and CLARISSA GLENN, | ) ) ) | |
| | ) | No. 16 CV 8940 |
| Plaintiffs | ) ) | |
| v. | ) ) | |
| CITY OF CHICAGO, Former CHICAGO POLICE SERGEANT RONALD WATTS, OFFICER KALLATT MOHAMMED, SERGEANT ALVIN JONES, OFFICER ROBERT GONZALEZ, OFFICER CABRALES, LT. MICHAEL J. STEVENS, OFFICER DOUGLAS NICHOLS, JR., OFFICER MANUEL S. LEANO, OFFICER BRIAN BOLTON, OFFICER KENNETH YOUNG, JR., OFFICER D. SOLTIS, OFFICER ELSWORTH J. SMITH, JR., OFFICER EDWARD W. GRIFFIN, OFFICER RODERICK WATSON, PHILIP J. CLINE, KAREN ROWAN, DEBRA KIRBY, and other as yet-unidentified officers of the Chicago Police Department, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Andrea R. Wood |
| Defendants. | ) ) | JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT

Plaintiffs, Ben Baker and Clarissa Glenn, by their attorneys, Loevy & Loevy, hereby

complain against the Defendants, City of Chicago, former Chicago Police Sergeant Ronald

Watts, former Chicago Police Officer Kallatt Mohammed, Sergeant Alvin Jones, Officer

Robert Gonzalez, Officer Cabrales, Star # 10719, Lt. Michael J. Stevens, Officer Douglas

Nichols, Jr., Officer Manuel S. Leano, Officer Brian Bolton, Officer Kenneth Young, Jr.,

Officer D. Soltis, Star # 19523, Officer Elsworth J. Smith, Jr., Officer Edward W. Griffin,

Officer Roderick Watson, Philip Cline, Karen Rowan, Debra Kirby, and other as-yet-unidentified officers of the Chicago Police Department, and state as follows:

### Introduction

1.      Ben Baker spent almost 10 years incarcerated for two alleged crimes that he did not commit. In fact, the crimes never happened; they were completely fabricated by Chicago police officers.

2.      At the time of Mr. Baker's wrongful convictions, he lived with his family in a Chicago public housing complex that was heavily policed by corrupt Chicago police officers.

3.      The officers sought bribes, planted drugs, and accused residents like Mr. Baker of possessing drugs they did not possess.

4.      On three occasions, the officers framed Mr. Baker for drug crimes he did not commit, subjecting him to criminal proceedings and harsh penalties. The officers even involved Mr. Baker's partner, Clarissa Glenn, into one of these cases, claiming that she possessed drugs along with Mr. Baker. Always adamant of his innocence, Mr. Baker forced the state to go to trial in the first two of these cases. But Mr. Baker soon learned that when it boiled down to his word against those of the officers, he lost. The criminal court simply would not believe his account of the officers' corruption. Altogether, Mr. Baker was sentenced to 18 years in prison and Ms. Glenn was sentenced to a year of probation as a result of the officers' misconduct.

5.      By the time Mr. Baker had served nearly 10 years, Defendants Ronald Watts and Kallatt Mohammed had been caught on tape engaging in the exact same

type of misconduct that Mr. Baker had alleged against them. The federal government charged Watts and Mohammed criminally, and the disgraced officers pled guilty and served time in federal prison.

6. Over that time, evidence has come to light showing that Watts and his police team members engaged in an ongoing pattern of criminal misconduct against public housing residents and that CPD officials knew about the pattern dating as far back as 2004. Through this lawsuit, Mr. Baker and Ms. Glenn seek accountability and compensation for losing a decade of his life due to Defendants' misconduct and the losses they suffered as a result of Defendants' misconduct.

### Jurisdiction and Venue

7. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

8. This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and state law claims pursuant to 28 U.S.C. § 1367.

9. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and Defendant City of Chicago is a municipal corporation located here. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

### The Parties

10. Mr. Baker is currently 44-years old. He currently lives with his partner, Clarissa Glenn, in Chicago, Illinois. Mr. Baker and Ms. Glenn live together

in Chicago, Illinois. At the time of the events giving rise to this suit, they lived together with their three sons in the Ida B. Wells housing complex in Chicago, Illinois. They were married in 2006.

11. At all relevant times, former Chicago Police Sergeant Ronald Watts, former Chicago Police Officer Kallatt Mohammed, Sergeant Alvin Jones, Officer Robert Gonzalez, Officer Cabrales, Lieutenant Michael J. Stevens, Officer Douglas Nichols, Jr., Officer Manuel S. Leano, Officer Brian Bolton, Officer Kenneth Young, Jr., Officer D. Soltis, Officer Elsworth J. Smith, Jr., and Officer Edward W. Griffin were Chicago police officers employed by the City of Chicago and acting within the scope of their employment and under color of law. Collectively, these individual Defendants are referred to as "Defendant Officers."

12. At all relevant times, Defendant Watts was a leader of the Second District Tactical Team that worked the Ida B. Wells housing complex. Some of the Defendant Officers, including Defendants Nichols, Jones, Gonzalez, Mohammed, Leano, Bolton, Smith, and Young, worked on Watts's tactical team.

13. At all relevant times, Officer Roderick Watson was the Supervisor of Defendant Watts.

14. At all relevant times, Defendant Philip J. Cline was the Superintendent of the Chicago Police Department.

15. At all relevant times, Defendants Karen Rowan and Debra Kirby were Assistant Deputy Superintendents of the Chicago Police Department, acting as the head of CPD's Internal Affairs Department. Collectively, these defendants,

4

Defendant Roderick Watson, and Defendant Cline are referred to as "Defendant Supervisory Officers."

16. The Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois. The City operates the Chicago Police Department ("CPD"). The City is responsible for the policies, practices, and customs of the City and the CPD.

## Factual Background

17. In June 2004, Ben Baker and Clarissa Glenn and their three children lived together in Chicago's Ida B. Wells housing complex.

18. At the time, the complex was actively patrolled by a tactical team of CPD officers led by Defendant Watts.

19. Watts and his tactical team members were well-known to the residents of Ida B. Wells. They maintained a visible presence and they had a reputation among residents of harassing young black men.

## Mr. Baker Refuses to Pay a Bribe to Defendant Watts

20. In June 2004, Mr. Baker was told that Defendant Watts planned to attribute drugs supposedly found in a mailbox at the housing complex to Mr. Baker.

21. Defendant Watts told Mr. Baker that if he gave Watts a $1,000 bribe, Mr. Baker would still have to "fight the case" but that Watts would ensure that Mr. Baker would "beat it."

22.     At the time, Mr. Baker had not been arrested or charged with any case relating to drugs found in a mailbox.

23.     Moreover, Mr. Baker had no knowledge of or involvement with any drugs supposedly found in a mailbox.

24.     Mr. Baker refused to pay Defendant Watts a bribe.

### The Defendants Fabricate a Drug Case to Punish
### Mr. Baker for Refusing to Pay a Bribe

25.     On or about July 11, 2004, one or more of the Defendant Officers, including Watts, Mohammed, Jones and an Unknown Chicago Police Officer stormed Mr. Baker's home with their guns drawn while Mr. Baker was home.

26.     One or more of the Defendant Officers put Mr. Baker in handcuffs.

27.     Defendant Watts told Mr. Baker words to the effect that "if we don't find nothing [in the house] you're going [to jail] for what was in the mailbox."

28.     At the time, Defendant Watts and the other Defendant Officers were aware that Mr. Baker never had any drugs in any mailbox.

29.     The Defendant Officers proceeded to illegally search Mr. Baker's house, but they found no drugs.

30.     The Defendant Officers arrested Mr. Baker and took him to jail anyway. The Defendant Officers caused Mr. Baker to be falsely charged with drugs in a mailbox.

31.     The Defendant Officers, including Defendants Watts, Young, Jones, Mohammed, worked together to create police reports that were false and fabricated about Mr. Baker's alleged possession of controlled substances.

32.     The Defendant Officers never disclosed to the prosecutors that they had fabricated evidence and falsified police reports relating to the July 2004 arrest.

33.     The Defendant Officers never disclosed to the prosecutors any of their misconduct described herein.

34.     As a result of that false arrest and wrongful prosecution, Mr. Baker spent four-and-a-half months awaiting trial in Cook County Jail.

### Mr. Baker's Trial on the Mailbox Case

35.     Mr. Baker went to trial on the mailbox case in late 2004.

36.     At the trial, the State called Defendants Jones and Young to testify against Mr. Baker.

37.     During his testimony, Defendant Jones lied under oath about Mr. Baker supposedly having possessed drugs in a mailbox.

38.     During his testimony, Defendant Young lied under oath about Mr. Baker supposedly having possessed drugs in a mailbox.

39.     In Defendant Young's zeal to fabricate a story about Mr. Baker, he failed to realize that the account he spun, if credited, meant that he conducted an unlawful search of Mr. Baker's mailbox.

7

40.     After Defendant Young's testimony, the presiding judge, Judge Michael Toomin, took unusual step of pausing the trial so that Mr. Baker's attorney could file a motion to suppress evidence.

41.     Subsequently, Mr. Baker's attorney filed a motion to suppress, which Judge Toomin granted.

42.     As a result, the State dismissed the case and Mr. Baker was released from county jail.

43.     Approximately one week later, Mr. Baker encountered Defendant Jones (who was often seen with and drove around with Defendant Watts) just outside the Wells housing complex.

44.     Mr. Baker complained to Defendant Jones about the false charges that Watts, Jones, Young, and the other Defendant Officers had placed on him, Defendant Jones replied that Mr. Baker beat the case because Young "fucked up his testimony," or words to that effect.

45.     Defendant Jones promised that next time they would make charges against Mr. Baker "stick."

46.     The Defendant Officers made good on their promise.

### Defendants' March 23, 2005 False Arrest of Mr. Baker

47.     On or about March 23, 2005, Mr. Baker was again arrested at the Wells complex by Defendants Watts and members of his tactical team.

48.     At the time of the arrest, Mr. Baker was leaving the housing complex to get his mother a birthday gift. He was not committing any crime, he was not in

8

possession of any drugs, and there was no probable cause to arrest him for anything.

49. Nevertheless, Defendants Nichols and Leano proceeded to take Mr. Baker into custody, placing him in the back of Leano's police car.

50. While Mr. Baker was in the back of Leano's car, Mr. Baker saw Nichols make a phone call, presumably to Watts.

51. Within minutes, Defendants Watts and Jones arrived in their own police car.

52. Upon their arrival, Jones said to Mr. Baker words to the effect of, "I told you we were going to get you." Mr. Baker also saw Watts talking to Nichols.

53. Defendants Leano and Nichols took Mr. Baker to the police station at 51st Street.

54. Thereafter, Watts, Jones, Leano, Nichols, Gonzalez, Bolton, Smith, Cabrales, and Stevens worked together to create police reports that were false and contained fabricated statements about Mr. Baker's alleged possession of controlled substances.

55. In reality, Mr. Baker did not possess any drugs. The drugs that the officers claim Mr. Baker possessed had been planted by the Defendant Officers.

56. The Defendant Officers subsequently caused Mr. Baker to be falsely charged with possession of heroin and cocaine with the intent to deliver.

57. Defendants Nichols, Gonzalez, Jones, and Watts subsequently testified against Mr. Baker.

58. The Defendant Officers committed this misconduct in retaliation for Mr. Baker's earlier refusal to pay Defendant Watts a $1,000 bribe.

59. During his testimony, Defendant Nichols lied under oath.

60. During his testimony, Defendant Gonzalez lied under oath.

61. During his testimony, Defendant Jones lied under oath.

62. During his testimony, Defendant Watts lied under oath.

63. The Defendant Officers never disclosed to the prosecutors that they had fabricated evidence and falsified police reports relating to the March 23, 2005 arrest. The Defendant Officers never disclosed to the prosecutors any of their misconduct described herein.

64. If the prosecutors had known that the Defendant Officers fabricated evidence and committed the other misconduct described herein, they would not have pursued the prosecution of Mr. Baker, and his unlawful deprivation of liberty on false charges would not have been continued.

65. Given that the entirety of the State's case against Mr. Baker rested on the Defendant Officers' fabrication of evidence—the planted drugs—and the lies of the Defendants, the exculpatory evidence described in the preceding paragraphs would have been material to Mr. Baker's defense of his criminal charges.

66. Mr. Baker would not have been convicted if it were not for the Defendant Officers' fabrication of evidence and withholding of exculpatory evidence.

10

67.     As a result of Defendant Officers' misconduct, Mr. Baker was wrongfully convicted on June 9, 2006 of two counts of possession of controlled substances and ultimately sentenced to 14 years' imprisonment on each count.

### The Defendants Threaten Mr. Baker and Ms. Glenn for Trying to Expose Their Corruption

68.     After Mr. Baker's wrongful arrests in summer 2004 and March 2005, but prior to Mr. Baker's June 2006 wrongful conviction, Mr. Baker and Ms. Glenn took several steps to attempt to expose the misconduct and corruption of the Defendant Officers, including making complaints directly to the CPD.

69.     Defendants Watts, Jones, Mohammed, and the other Defendant Officers learned about Mr. Baker's and Ms. Glenn's attempt to expose their criminal conduct.

70.     Soon after, some of the Defendant Officers, including Defendants Jones, Mohammed, and Watts confronted Ms. Glenn about the fact that she had complained about them to the City, calling her a "bitch," telling her that she would wind up in the penitentiary with her husband, and warning her in a threatening manner to "be careful."

### Defendants Pin Yet Another False Case on Mr. Baker in Retaliation, This Time Also Involving Ms. Glenn

71.     On or about December 11, 2005, Mr. Baker was on bond awaiting trial on the false charges arising from his March 23, 2005 arrest.

72. That day, Defendants Watts and Jones approached Mr. Baker and Ms. Glenn while they were pulling their truck into a parking lot near the Wells housing complex.

73. Defendants Watts and Jones ordered Mr. Baker and Ms. Glenn out of the truck and told them put their hands on the truck.

74. Without permission or any legal justification, Defendants Watts and Jones searched the truck.

75. Neither Mr. Baker nor Ms. Glenn had anything illegal in the truck.

76. Neither Mr. Baker nor Ms. Glenn had anything illegal on their persons.

77. Neither Mr. Baker nor Ms. Glenn had any drugs.

78. After Defendants Watts and Jones searched the truck and found nothing illegal, Defendant Watts pulled a plastic bundle that appeared to contain narcotics out of his sleeve, falsely claiming that he found the narcotics in the truck.

79. Defendants Watts and Jones then took Mr. Baker and Ms. Glenn into custody, despite the fact that there was no probable cause to believe that either one of them had committed a crime.

80. The Defendant Officers, including Defendants Watts, Jones, Mohammed, Leano, Smith, Soltis, Gonzalez, and Griffin worked together to create false police reports about the arrest to make it appear that Mr. Baker and Ms. Glenn had committed crimes, when, in fact, they had not.

81.     One or more of the Defendant Officers also unlawfully impounded the truck and falsely claimed that they found drugs inside of it.

82.     All of these facts were fabricated by the Defendant Officers in order to falsely arrest Mr. Baker and Ms. Glenn and cause their wrongful prosecutions.

83.     The Defendant Officers committed this misconduct in retaliation for Mr. Baker's and Ms. Glenn's speaking out about the Defendant Officers' corruption, and in retaliation for Mr. Baker's earlier refusal to pay Defendant Watts a $1,000 bribe.

84.     As a result of Defendants' misconduct in connection with the December 2005 arrest, Mr. Baker and Ms. Glenn were both charged with serious felony drug crimes.

85.     The Defendant Officers never disclosed to the prosecutors the fact that they had fabricated evidence and falsified police reports relating to the December 2005 arrest of Mr. Baker and Ms. Glenn. The Defendant Officers never disclosed to the prosecutors any of their misconduct described herein.

86.     Given that the entirety of the State's case against Mr. Baker and Ms. Glenn rested on the Defendant Officers' fabrication of evidence—the planted drugs—the exculpatory evidence described in the preceding paragraphs would have been material to Mr. Baker and Ms. Glenn's defense of their criminal charges.

87.     If the prosecutors had known that the Defendant Officers fabricated evidence and committed the other misconduct described here, they would not have

pursued the prosecution of Mr. Baker, and his unlawful deprivation of liberty would not have been continued.

### Mr. Baker and Ms. Glenn Pleaded Guilty to the Charges on the December 2005 Case so that Their Young Children Would Have a Parent to Raise Them

88.     The State elected to proceed first on the March 2005 drug case against Mr. Baker.

89.     During the pendency of the March 2005 case, no substantive proceedings were held for either Mr. Baker or Ms. Glenn on the case arising from the December 2005 arrest.

90.     In June 2006, Mr. Baker was found guilty on the March 2005 case, and, in July 2006, he was sentenced to 14 years in prison.

91.     Mr. Baker and Ms. Glenn were initially adamant about fighting the December 2005 case; they both were completely innocent and they knew they had been framed.

92.      However, after Mr. Baker was wrongfully convicted on the March 2005 case, they became fearful of going to trial on the December 2005 case.

93.     The same officers who testified against Mr. Baker in the March 2005 case would testify against both of them in the December 2005 case. Moreover, the same judge who presided over Mr. Baker's March 2005 case would preside over the December 2005 case and would almost certainly credit the officers' account over the accounts of Mr. Baker and Ms. Glenn.

14

94.     Mr. Baker and Ms. Glenn knew that if Ms. Glenn was convicted on even one of the charges against her, she faced a four-year minimum prison sentence.

95.     If Ms. Glenn went to prison for four years, their children would be left with no parents to raise them, a possible outcome that neither Mr. Baker nor Ms. Glenn could bear.

96.     Thus, when the State's Attorney's Office offered to reduce Ms. Glenn's charges and recommend one year of probation for her and a four-year sentence for Mr. Baker in exchange for guilty pleas by both, they had no real choice but to accept.

97.     Mr. Baker and Ms. Glenn proceeded to plead guilty, not because they were actually guilty, but to protect their children and prevent their family from being completely destroyed as a result of the Defendant Officers' misconduct.

98.     Mr. Baker and Ms. Glenn would not have been convicted if it were not for the Defendant Officers' fabrication of evidence and withholding of exculpatory evidence.

99.     During the plea hearing, the trial judge—Judge Michael Toomin— acknowledged that Mr. Baker and Ms. Glenn alleged that they were the victims of misconduct by the Defendant Officers. Judge Toomin indicated that he did not believe their stories, but that if evidence came to light in the future to support their claims, then the convictions could not stand.

15

### Defendant Watts and His Crew Engaged in a Pattern of Misconduct
### for at Least a Decade, All Facilitated by City's Code of Silence

100. It was no secret within CPD that Watts and his crew engaged in type of misconduct of which Mr. Baker and Ms. Glenn accused them.

101. Government officials, including those with the City of Chicago, had knowledge of Watts's and his crew's alleged misconduct as early as 1999.

102. By 2004, an FBI investigation of Watts and his crew was well underway. The FBI investigation took place with the knowledge and occasional participation of the Chicago Police Department's Internal Affairs Department (IAD).

103. Because IAD was kept abreast of the FBI investigation, City officials—including but not limited to the head of IAD and CPD Superintendent Philip J. Cline—were aware of credible allegations that Watts and his team were extorting and soliciting bribes from drug dealers.

104. According to another source who was interviewed, Watts used a drug dealer named "Big Shorty" to run drugs at the Ida B. Wells complex. Big Shorty would sell the drugs, turning profits over to Watts in exchange for Watts's protection. According to the source, Watts also used drug dealers as phony informants to obtain illegitimate search warrants and Watts also offered to let arrestees go if they provided him with weapons.

105. Targets of the FBI investigation extended beyond Watts to members of Watts's tactical team, such as Defendants Bolton, Gonzalez, Jones, Nichols, Mohammed, Smith, and Leano.

106. By 2010, the FBI investigation generated evidence to show that Watts engaged in systemic extortion of drug dealers, theft, the possession and distribution of drugs for money, planting drugs on subjects, and paying informants with drugs.

107. Investigators also determined that Watts and his subordinates had engaged in these activities for the prior ten years.

### Watts and Mohammed Are Charged With Federal Crimes

108. In 2012, after nearly a decade of engaging in criminal misconduct, Defendants Watts and Mohammed were caught red-handed, shaking down a person they thought was a drug courier, but was actually an agent for the FBI.

109. The United States government subsequently charged Watts and Mohammed with federal crimes.

110. Watts and Mohammed each pled guilty to federal criminal charges and were sentenced to terms of imprisonment. *See United States v. Watts*, No. 12-CR-87-1 (N.D. Ill.); *United States v. Mohammed*, No. 12-CR-87-2 (N.D. Ill.).

111. In its sentencing memorandum in the Watts case, the Government explained that "[f]or years," "the defendant [Watts] used his badge and his position as a sergeant with the Chicago Police Department to shield his own criminal activity from law enforcement scrutiny." His crimes included "stealing drug money and extorting protection payments" from the individuals he was sworn to protect and serve.

112. The government revealed that, for years, Defendants Watts and Mohammed extorted tens of thousands of dollars of bribes from individuals at the

Wells public housing complex on numerous occasions as part of their duties with the Chicago Police Department.

113. During the sentencing hearing, the Government urged Judge Sharon Johnson Coleman to "consider the other criminal conduct that the defendant [Watts] engaged in in the course of his career as a police officer," specifically noting that during the federal investigation Watts "did other things such as putting a false case on the confidential source that was involved in our investigation. Had him arrested on drug charges. And the source … felt he had no chance of successfully fighting that case so he pled guilty to a crime he didn't commit." The federal prosecutor wondered aloud "how many times [Watts] might have done something similar when the government was not involved."

114. Following the federal indictments of Watts and Mohammed, City officials made efforts to downplay magnitude of Watts's criminal enterprise.

115. Notwithstanding the evidence that investigators had amassed over the years pointing to a wide, decade long criminal enterprise, CPD Superintendent Garry McCarthy publicly stated, "there is nobody involved other than the two officers who were arrested."

## The City's "Code of Silence"

116. While the federal government was investigating Watts and his crew, a "code of silence" existed within the Chicago Police Department.

117. Under this code, police officers are expected to conceal each other's misconduct, in contravention of their sworn duties, and penalties for breaking the code of silence within the CPD are severe.

118. As one CPD officer has explained, "[The Chicago Police Academy told officers] over and over again we do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

119. Pursuant to this "code of silence," each of the Defendant Officers concealed from Mr. Baker and Ms. Glenn information that Watts and his teammates were in fact engaged in a wide-ranging pattern of misconduct. Had this information been disclosed to Mr. Baker and Ms. Glenn, they would have used it to impeach the officers' accounts, which would have changed the outcome of the criminal proceedings instituted against them.

120. Also, consistent with this "code of silence," the few people who stood up to Watts and his crew and/or attempted to report his misconduct were either ignored or punished, and Watts and his crew continued to engage in misconduct with impunity.

19

### Careers of CPD Officers Daniel Echeverria
### and Shannon Spaulding Are Nearly Ruined

121.   For example, in 2006, two Chicago police officers, Daniel Echeverria and Shannon Spaulding learned credible information from arrestees that Watts and his crew were engaged in illegal drug activity.

122.   Officer Echeverria took the allegation seriously and he reported it to a CPD supervisor. The supervisor made clear that he was not interested in learning about the allegation, and he directed Echeverria not to document the allegations.

123.   Echeverria and Spaulding subsequently reported the allegations about Watts and his crew to the FBI.  Soon thereafter, Spaulding and Echeverria began cooperating with the FBI, actively assisting the FBI's investigation of Watts and his crew.

124.   When their cooperation became known to officers within their CPD chain of command, Spaulding and Echeverria were labeled "rats" within the Department, their lives were threatened, and they endured all manner of professional retaliation by members of the CPD.

125.   Spaulding and Echeverria subsequently sued the City for the retaliation they suffered for blowing the whistle on Watts and his crew. On the eve of trial in that case, the City settled for $2 million.

### CPD Officer Michael Spaargaren's Life Is Threatened

126.   Sometime in the mid-2000s, a CPD officer named Michael Spaargaren was assigned to work with Watts in public housing.

127. Spaargaren observed Watts did not inventory drugs and money that the officers seized during arrests, and Spaargaren confronted Watts about the misconduct.

128. In response, Watts threatened to put a false case against Spaargaren and made veiled threats to kill him.

129. A CPD Lieutenant in the chain of command subsequently warned Spaargaren to keep his mouth shut, or his life would be in danger.

130. Fearful for his life, Spaargaren opted to take a one-and-a-half-year leave of absence from CPD rather than to continue to work under Watts.

## Citizen Complaints Go Nowhere

131. Defendants Watts, Mohammed, and other members of Watts's tactical team had accumulated dozens of citizen complaints concerning violations of their civil rights over the years, beginning well before the misconduct Defendants committed against Mr. Baker and Ms. Glenn.

132. On information and belief, not a single one of these complaints resulted in any discipline against any member of Watts's crew.

133. On information and belief, complaints that the City bothered to investigate largely boiled down to a he-said-she-said between the officer and the citizen, and to the City's policy to resolve those disputes in the officers' favor, no matter how many citizens come forward with the same type of complaint.

### The City Turns a Blind Eye to the Clear Pattern of
### Alleged Misconduct that Emerged from Watts and His Crew

134. Despite all of the evidence that was amassed over the years of a pattern and practice of criminal misconduct by the Defendant Officers, on information and belief, City never undertook its own investigation of the clear pattern that emerged.

135. Instead, City officials deferred to the FBI's criminal investigation of Watts and his crew.

136. As City officials were aware, however, the purpose of the FBI investigation was to investigate and prosecute criminal activity, not to impose discipline and control of the City's Police Department.

137. Nothing about the FBI investigation relieved the City of its fundamental responsibility to supervise, discipline, and control its officers. Nevertheless, the City completely abdicated this responsibility.

138. During the FBI investigation, which spanned at least eight years, City officials had reason to believe that Watts and his crew were committing ongoing criminal activity on the streets—extorting drug dealers and framing citizens of crimes they did not commit—yet City officials took no steps to prevent abuses from occurring.

139. Instead, City officials let officers on Watts's crew continue to institute criminal charges against citizens like Mr. Baker, and to testify falsely against citizens like Mr. Baker.

140.    Even worse, the City officials withheld information they had about the officers' pattern of misdeeds, information that citizens like Mr. Baker and Ms. Glenn could have used to impeach the corrupt officers and defend against the bogus criminal charges placed upon them.

### Mr. Baker's and Ms. Glenn's Exonerations

141.    When Watts and Mohammed were finally publicly exposed as criminals, Mr. Baker was determined to get back into court.

142.    After retaining counsel and obtaining documents from the FBI through the Freedom of Information Act, Mr. Baker filed a post-conviction petition with the evidence to finally convince the court and prosecutors to believe what he had been saying all along: that Watts and his teammates were crooked cops who framed him.

143.    Within weeks of receiving Mr. Baker's petition, on January 14, 2016, the Cook County State's Attorney dismissed all charges in the March 2005 case. Mr. Baker was released from the Illinois Department of Corrections that same day.

144.    Mr. Baker then filed another post-conviction petition seeking to overturn his guilty plea in the December 2005 case. Ms. Glenn also joined this petition to overturn her guilty plea on the same case.

145.    Just six days after filing, on March 23, 2016, the Circuit Court of Cook County vacated both convictions in that case and the Cook County State's Attorney's Office dismissed all charges against both Mr. Baker and Ms. Glenn.

146. During the course of these post-conviction proceedings, the Chief of the Criminal Prosecutions Bureau of the Cook County State's Attorney's Office called Defendant Watts a "dirty police officer."

147. Mr. Baker subsequently received certificates of innocence for both of his convictions.

### The Damages Suffered by Mr. Baker and Ms. Glenn

148. Mr. Baker lost nearly a decade of his life before he was finally exonerated.

149. The emotional pain and suffering caused by losing nearly ten years has been enormous. During his wrongful incarceration, Mr. Baker was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, births, funerals, and other life events with loved ones, the opportunity to raise his children and spend time with his grandchildren, and the fundamental freedom to live one's live as an autonomous human being.

150. For nearly a decade, Ms. Glenn was separated from Mr. Baker, her husband and life partner. During this time, she suffered the loss of his companionship, love, and support, and struggled to raise their children on her own.

151. In addition, Ms. Glenn suffered the consequences of having a wrongful felony conviction on her record, which created barriers to housing and employment opportunities that continue to this day.

152. As a result of the foregoing, Mr. Baker and Ms. Glenn have suffered tremendous damage, including physical sickness and injury and emotional damages, all proximately caused by Defendants' misconduct.

### Count I: 42 U.S.C. § 1983 – Due Process

153. Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

154. In the manner described more fully above, the Defendant Officers, while acting as investigators, individually, jointly, and in conspiracy with each other, deprived Plaintiffs of their constitutional right to due process and a fair trial.

155. In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory evidence from Plaintiffs and from state prosecutors, among others, as well as knowingly fabricated false evidence, thereby misleading and misdirecting the criminal prosecutions of Plaintiffs.

156. Likewise, in the manner described more fully above, Defendants Philip J. Cline, Roderick Watson, Karen Rowan, Debra Kirby, and other as-yet-unidentified CPD supervisors, had knowledge of a pattern of misconduct by Watts and his team. These Defendant Supervisory Officers knew of a substantial risk that Watts and his team would violate the rights of Plaintiffs and other residents of the Ida B. Wells complex, and they deliberately chose a course of action that allowed those abuses to continue, thereby condoning those abuses.

157. The constitutional injuries complained of herein were proximately caused by the intentional misconduct of the Defendant Supervisory Officers, or were

25

proximately caused when the Defendant Supervisory Officers were deliberately, recklessly indifferent to their subordinates' misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Plaintiffs' constitutional rights.

158. In addition, the Defendant Supervisory Officers themselves concealed exculpatory evidence from Plaintiffs, specifically information about Watts's and his team's pattern of misconduct. In this way, the Defendant Supervisory Officers violated Plaintiffs' due process rights to a fair trial deliberately and with reckless disregard to Plaintiffs' rights.

159. The Defendants' misconduct directly resulted in the unjust criminal convictions of Plaintiffs, thereby denying their constitutional rights to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiffs could not and would not have been pursued.

160. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiffs' clear innocence.

161. The Defendants' actions were taken under color of law and within the scope of their employment.

162. The City of Chicago is also directly liable for the injuries described in this Count because the City and CPD maintained official policies and customs that were the moving force behind the violation of Plaintiffs' rights and also because the

26

actions of the final policymaking officials for Defendant City of Chicago and the CPD were moving force behind the violation of Plaintiffs' rights.

163.    At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Chicago maintained a system that violated the due process rights of criminal defendants like Mr. Baker and Ms. Glenn by concealing exculpatory evidence of officers' patterns of misconduct.

164.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Chicago had notice of a widespread practice by its officers and agents under which criminal suspects, such as Plaintiffs, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were deprived of liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

165.    As a matter of both policy and practice, the Defendant City directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise, control, and discipline its police officers, such that its failure to do so manifests deliberate indifference. The Defendant City's actions lead police officers in the City of Chicago to believe that their actions will never be scrutinized and, in that way, directly encourages further abuses such as those that affected Plaintiffs.

27

166. The above-described widespread practices, which were so well-settled as to constitute the *de facto* policy of the City of Chicago, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. These widespread practices were allowed to flourish because the Defendant City and the CPD declined to implement sufficient policies or training, even though the need for such policies and training was obvious. The Defendant City and the Department also declined to implement any legitimate mechanism for oversight or punishment of officers, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

167. Furthermore, the misconduct described in this Complaint was undertaken pursuant to the policy and practices of the Defendant City of Chicago in that the constitutional violations committed against Plaintiffs were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago and the CPD, or were actually committed by persons with such final policymaking authority.

168. Indeed, municipal policymakers have long been aware of the Defendant City's policy and practice of failing to properly train, monitor, investigate, and discipline misconduct by its police officers, but have failed to take action to remedy the problem.

169. For example, at a City Council hearing on September 28, 1999, in response to two high-profile unjustified police shootings, Superintendent Terry

28

Hillard noted the need for better in-service training on the use of force, early detection of potential problem officers, and officer accountability for the use of force.

170. Likewise, in June 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

171. In 2001, the Justice Coalition of Greater Chicago ("JCGC"), a coalition of more than a hundred community groups, confirmed the findings of that resolution, concluding that the Chicago Police Department lacked many of the basic tools necessary to identify, monitor, punish and prevent police misconduct. The JCGC findings were presented to Mayor Daley, Superintendent Hillard, and the Chicago Police Board.

172. Despite the municipal policymakers' knowledge of the City's failed policies and practices to adequately train, supervise, investigate, discipline, and control its police officers, nothing was done to remedy these problems.

173. As a result, the CPD has continued to respond to complaint of police misconduct inadequately and with undue delay, and to recommend discipline in a disproportionately small number of cases.

174. Indeed, by its own admissions, over 99% of the time when a citizen complains that his or her civil rights were violated by police officers, the City sides with the police officer and concludes that no violation occurred.

29

175.    For example, in 2005, at least 1,592 complaints of civil rights violations were lodged against Chicago police officers with the Internal Affairs Division. A total of five were sustained, and that total may include cases arising in previous years.

176.    In other words, IAD sustained only 0.314% of the complaints that its police officers had committed civil rights violations in 2005.

177.    In 2006, the number of civil rights complaints was 1,492. Twelve were sustained. Based on those numbers, IAD sustained only 0.8% of the civil rights complaints against Chicago police officers in 2006.

178.    The same unconstitutionally lax oversight is evidence across the multiple entities that have been responsible for investigating police misconduct. In 2006, for example, the Office of Professional Standards ("OPS"), which investigates complaints of excessive force, sustained only 57 out of 2,391 complaints of excessive force by police officers, or 2%.

179.    Notably, Defendants Watts and Mohammed are not the first Chicago police officers who were allowed to abuse citizens with impunity over a period of years while the City turned a blind eye.

180.    For instance, in 2011, Chicago police officer Jerome Finnigan was convicted and sentenced on federal criminal charges, including a charge of attempting to hire someone to kill a police officer who Finnigan believed would be a witness against him on his own corruption charges in state court.

30

181. Finnigan was part of a group of officers in the Defendant City's Special Operations Section who carried out robberies, home invasions, unlawful searches and seizures, and other crimes.

182. Finnigan and his crew engaged in their misconduct at around the same time that Mr. Baker and Ms. Glenn were targeted by Defendant Watts and his crew.

183. Finnigan, like the Defendant Officers in this case, had accumulated dozens of complaints over the years, which the Defendant City routinely deemed unfounded or not sustained.

184. At his sentencing hearing in 2011, Finnigan stated, "You know, my bosses knew what I was doing out there, and it went on and on. And this wasn't the exception to the rule. This was the rule."

185. Likewise, in 2001, Chicago police officer Joseph Miedzianowski was convicted on federal criminal charges, including racketeering and drug conspiracy. The jury found that Miedzianowski's engaged in corruption for much of his 22-year police career, using his street informants to shake down drug dealers and sell drugs.

186. Miedzianowski, like the Defendant Officers in this case, had accumulated dozens of complaints over the years, which the Defendant City routinely deemed unfounded or not sustained.

187. In the case of *Klipfel v. Bentsen*, No. 94-cv-6415 (N.D. Ill.), a federal jury found that as of 1994 the CPD maintained a code of silence that facilitated misconduct committed by Miedzianowski.

188. Likewise, in the case of *Obrycka v. City of Chicago et al.*, No. 07-cv-2372 (N.D. Ill.) (the Abbate case), a federal jury found that as of February 2007 "the City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

189. The same constitutionally-defective oversight system in place during the time periods at issue in the *Klipfel* case and in the *Obrycka* case were also in place in 2004 through 2006, when Mr. Baker suffered the abuse described above.

190. The same code of silence in place at the CPD during the time periods at issue in the in the *Klipfel* case and in the *Obrycka* case were also in place in 2004 through 2006, when Mr. Baker and Ms. Glenn suffered the abuse described above.

191. Indeed, the problems found to exist by the jury in *Klipfel* and *Obrycka* continues to this day. In December 2015, Mayor Rahm Emanuel acknowledged that a "code of silence" exists within the Chicago Police Department that encourages cover-ups of police misconduct, and that the City's attempts to deal with police abuse and corruption have never been adequate.

192. The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiffs to suffer the grievous and permanent injuries and damages set forth above.

193. The Defendant City's investigation of complaints is characterized by unreasonably long delays, despite the relative straight-forward nature of many misconduct claims.

194. Although the Defendant City has long been aware that its supervision, training, and discipline of police officers is entirely inadequate, it has not enacted any substantive measures to address that deficiency.

195. Instead, the Defendant City continues to inadequately investigate citizen complaints. It has also failed to modify its officer training programs to reduce misconduct against Chicago residents or to implement a system to identify and track repeat offenders, districts, or units.

196. Plaintiffs' injuries were caused by officers, agents, and employees of the Defendant City of Chicago and the Chicago Police Department, including but not limited to the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

### Count II: 42 U.S.C. § 1983 – Due Process – Federal Malicious Prosecution

197. Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

198. In the manner described more fully above, the Defendants, acting as investigators, individually, jointly, and in conspiracy with each other, accused Plaintiffs of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiffs without any probable cause for doing so and in spite of the fact that they knew Plaintiffs were innocent.

199. In doing so, Defendants caused Plaintiffs to be unreasonably seized without probable cause and deprived of his liberty, in violation of Plaintiffs' rights secured by the Fourth and Fourteenth Amendments.

200. The false judicial proceedings against Plaintiffs were instituted and continued maliciously, resulting in injury.

201. Plaintiffs' criminal prosecutions were terminated in their favor, in a manner indicative of innocence.

202. Defendants deprived Plaintiffs of fair state criminal proceedings, including the chance to defend themselves during those proceedings, resulting in a deprivation of liberty.

203. In addition, Defendants subjected Plaintiffs to arbitrary governmental action that shocks the conscience in that Plaintiffs were deliberately and intentionally framed for a crime of which they were totally innocent, through Defendants' fabrication and suppression of evidence.

204. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiffs' clear innocence.

205. The Defendants' actions were taken under color of law and within the scope of their employment.

206. As a result of Defendants' misconduct described in this Count, Plaintiffs suffered loss of liberty, great mental anguish, humiliation, degradation,

physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

207. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for the Defendant City of Chicago, in the manner described more fully above.

### Count III: 42 U.S.C. § 1983 – First Amendment

208. Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

209. In the manner described more fully above, Defendant Officers violated Plaintiffs' rights as secured by the First Amendment of the U.S. Constitution. Plaintiffs' complaints about the Defendant Officers' misconduct constituted protected speech and expression under the First Amendment. Plaintiffs' complaints were also protected under the Petition Clause of the First Amendment: Mr. Baker and Ms. Glenn were petitioning the government for redress of grievances.

210. In the manner described more fully above, Defendant Officers' actions caused Plaintiffs to suffer injuries that would chill a person of ordinary firmness from continuing to engage in protected activity.

211. Plaintiffs' protected First Amendment activity was at least a motivating factor in Defendant Officers' decision to take retaliatory action. The Defendant Officers would not have pinned a second false drug case on Mr. Baker and one on Ms. Glenn in the absence of their protected First Amendment activity.

35

212. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiffs' clear innocence.

213. The Defendants' actions were taken under color of law and within the scope of their employment.

214. As a result of Defendants' misconduct described in this Count, Plaintiffs suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count IV: 42 U.S.C. § 1983 – Failure to Intervene

215. Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

216. In the manner described more fully above, during the constitutional violations described herein, the Defendants stood by without intervening to prevent the violation of Plaintiffs' constitutional rights, even though they had the opportunity to do so.

217. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiffs' innocence.

218. The Defendants' actions were taken under color of law and within the scope of their employment.

36

219.    As a result of Defendants' misconduct described in this Count, Plaintiffs suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

220.    Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for the Defendant City of Chicago, in the manner described more fully above.

### Count V: 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

221.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

222.    Prior to Plaintiffs' convictions, all of the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiffs for crimes they did not commit and thereby to deprive them of their constitutional rights, all as described above.

223.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Plaintiffs of their rights.

224.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

37

225. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiffs' innocence.

226. The Defendants' actions were taken under color of law and within the scope of their employment.

227. As a result of Defendants' misconduct described in this Count, Plaintiffs suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

228. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for the Defendant City of Chicago, in the manner described more fully above.

### Count VI: Illinois Law – Malicious Prosecution

229. Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

230. In the manner described more fully above, Defendants accused Plaintiffs of criminal activity and exerted influence to initiate, continue and perpetuate judicial proceedings against Plaintiffs without any probable cause for doing so.

231.    In so doing, these Defendants caused Plaintiffs to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

232.    Plaintiffs' criminal prosecutions were terminated in their favor, in a manner indicative of innocence.

233.    The Defendants' actions were taken under color of law and within the scope of their employment.

234.    As a result of Defendants' misconduct described in this Count, Plaintiffs suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count VII: Illinois Law – Intentional Infliction of Emotional Distress

235.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

236.    The actions, omissions, and conduct of the Defendant Officers, as set forth above, were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiffs, as is more fully alleged above.

237.    The Defendants' actions were taken under color of law and within the scope of their employment.

238. As a result of Defendants' misconduct described in this Count, Plaintiffs suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

<b>Count VIII: Illinois Law – Civil Conspiracy</b>

239. Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

240. As described more fully in the preceding paragraphs, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiffs for crimes they did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiffs of their rights.

241. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

242. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiffs' innocence.

243. As a result of Defendants' misconduct described in this Count, Plaintiffs suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count IX: Illinois Law – Loss of Consortium

244. Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

245. In the manner described more fully above, the Defendants tortuously caused each of the Plaintiffs to be deprived of the services, society, support, felicity, and companionship of one another, all without justification.

246. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiffs' innocence.

247. As a result of Defendants' misconduct described in this Count, Plaintiffs suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count X: Illinois Law – *Respondeat Superior*

248. Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

249. While committing the misconduct alleged in the preceding paragraphs, Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

250. Defendant City of Chicago is liable as principal for all torts committed by their agents.

41

## Count XI: Illinois Law – Indemnification

251. Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

252. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment.

253. Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiffs Ben Baker and Clarissa Glenn respectfully request that this Court enter a judgment in their favor and against the City of Chicago, former Chicago Police Sergeant Ronald Watts, former Chicago Police Officer Kallatt Mohammed, Sergeant Alvin Jones, Officer Robert Gonzalez, Officer Cabrales, Star # 10719, Lt. Michael J. Stevens, Officer Douglas Nichols, Jr., Officer Manuel S. Leano, Officer Brian Bolton, Officer Kenneth Young, Jr., Officer D. Soltis, Star # 19523, Officer Elsworth J. Smith, Jr., Officer Edward W. Griffin, Officer Roderick Watson, Philip Cline, Karen Rowan, Debra Kirby, and other as-yet-unidentified officers of the Chicago Police Department, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

42

## JURY DEMAND

Plaintiffs Ben Baker and Clarissa Glenn hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Elizabeth Wang
One of Plaintiffs' Attorneys

Jon Loevy
Russell Ainsworth
Elizabeth Mazur
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
O: 312.243.5900
F: 312.243.5902
jon@loevy.com
russell@loevy.com
elizabethm@loevy.com

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, CO 80302
O: 720.328.5642
F: 312.243.5902
elizabethw@loevy.com

43