**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

BEN BAKER and CLARISSA GLENN,     )
                                            )
           Plaintiffs,          )
                                            )     No. 16-cv-08940
      v.                      )
                                            )     Judge Andrea R. Wood
CITY OF CHICAGO, et al.,           )
                                            )
          Defendants.      )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Ben Baker and Clarissa Glenn allege that a group of Chicago Police Department

("CPD") officers led by former sergeant Ronald Watts concocted a scheme to frame Baker for

drug crimes. As part of the scheme, in March 2005, officers planted heroin and cocaine on Baker

before arresting him. Then, in December 2005, officers arrested Baker and Glenn after planting

narcotics in their truck. After Baker was convicted on the March 2005 charges, both Baker and

Glenn pleaded guilty to the December 2005 charges to avoid a prison sentence for Glenn. An

investigation by the Federal Bureau of Investigation ("FBI") subsequently revealed that Watts

and his team had engaged in bribery and other forms of corruption, and Baker and Glenn

successfully sought to have their convictions overturned. Baker and Glenn then brought this

lawsuit against a number of current and former CPD officers, asserting eleven claims: federal

claims alleging violation of due process rights, malicious prosecution, violation of First

Amendment rights, failure to intervene, and conspiracy, all pursuant to 42 U.S.C. § 1983 (Counts

I, II, III, IV, and V); state law claims for malicious prosecution, intentional infliction of

emotional distress, conspiracy, and loss of consortium (Counts VI, VII, VIII, and IX); and state

law claims against the City of Chicago ("City") only, seeking to hold the City responsible for the

actions of Watts and his team based on a theory of *respondeat superior* and the state indemnification statute (Counts X and XI). Defendants have jointly moved to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 67.) For reasons stated below, the motion is granted with respect to the federal malicious prosecution claim only.

## BACKGROUND

For purposes of the motion to dismiss, the Court accepts as true all well-pleaded allegations in the First Amended Complaint ("FAC") and draws all reasonable inferences from those allegations in Plaintiffs' favor. *See Williamson v. Curran*, 714 F.3d 432, 435 (7th Cir. 2013). The FAC alleges as follows.

In 2004, Baker and Glenn lived in an area of Chicago patrolled by a tactical team of CPD officers led by then-Sergeant Watts. (FAC ¶¶ 17–18, Dkt. No. 24.) After Baker refused to pay Watts a bribe, Watts and CPD Officers Kallatt Mohammed and Alvin Jones illegally entered and searched Baker's home before falsely charging him with possessing "drugs in a mailbox." (*Id.* ¶¶ 24–30.) Watts, Mohammed, Jones, and Kenneth Young, Jr. worked together to create false police reports substantiating the possession charge. (*Id.* ¶ 31.) After Young provided fabricated testimony intended to implicate Baker but also suggesting that the search of Baker's mailbox was unlawful, Baker's attorney filed a motion to suppress the evidence of drugs found in the mailbox and the prosecutor dismissed the case. (*Id.* ¶¶ 39, 41–42.) Jones later told Baker that he only "beat the case" because of Young's testimony, and that next time, "they" would make charges against Baker "stick." (*Id.* ¶¶ 44–45.)

Then, on March 23, 2005, CPD Officers Douglas Nichols, Jr. and Manuel Leano arrested Baker without probable cause as he was leaving his home. (*Id.* ¶¶ 47–49.) Jones and Watts arrived on the scene shortly thereafter and conferred with Nichols and Leano, at which point

2

Jones told Baker, "I told you we were going to get you." (*Id*. ¶ 52.) After Leano and Nichols took Baker to the police station, those officers, along with Watts, Jones, Robert Gonzalez, Brian Bolton, Elsworth Smith, Miguel Cabrales, and Michael Stevens,[1] created false police reports regarding Baker's alleged possession of drugs. (*Id*. ¶¶ 53–54.) None of those officers disclosed that they had fabricated evidence and falsified police reports. (*Id*. ¶ 63.) Moreover, Nichols, Gonzalez, Jones, and Watts lied under oath at Baker's trial. (*Id.* ¶¶ 59–62.) As a result of the fabricated evidence and false testimony, on June 9, 2006, Baker was convicted of two counts of possession of controlled substances and sentenced to fourteen years of imprisonment on each count. (*Id*. ¶ 67.)

Plaintiffs complained to the CPD about the misconduct by the aforementioned Defendant Officers.[2] (*Id*. ¶ 68.) But none of their complaints resulted in discipline because the City had a policy of resolving such disputes in favor of its officers. (*Id.* ¶¶ 132–33.) After learning about Plaintiffs' efforts to have Defendant Officers disciplined, Jones, Mohammed, and Watts threatened Glenn with jail time if she was not careful. (*Id*. ¶ 70.) On December 11, 2005, Watts and Jones arrested both Baker and Glenn in a parking lot near their residence. (*Id*. ¶¶ 71, 79.) Watts and Jones searched Baker and Glenn's truck and, finding nothing, planted narcotics in the truck and took Baker and Glenn into custody. (*Id*. ¶¶ 78–79.) Watts, Jones, Mohammed, Leano, Smith, D. Soltis, Gonzalez, and Edward W. Griffin[3] created false police reports regarding the arrest. (*Id*. ¶ 80.) None of those officers disclosed that they had fabricated evidence and falsified police reports. (*Id*. ¶ 85.) Because Baker had been wrongfully convicted before and they believed

---

[1] Stevens has been voluntarily dismissed as a defendant. (Dkt. No. 117.)

[2] "Defendant Officers," as used herein, refers to Watts, Jones, Mohammed, Leano, Smith, D. Soltis, Gonzalez, Cabrales, Nichols, Bolton, Young, and Smith, collectively.

[3] Griffin has been voluntarily dismissed as a defendant. (Dkt. No. 117.)

a judge would credit the officers' account over theirs, Baker and Glenn accepted plea deals so that Glenn could avoid a prison sentence and stay with the couple's children. (*Id*. ¶¶ 92–97.)

An FBI investigation of Watts and his tactical team eventually exposed their participation in extortion, theft, and planting drugs on suspects, among other misconduct. (*Id*. ¶¶ 106–08.) Watts and Mohammed pleaded guilty to federal criminal charges and were imprisoned. (*Id*. ¶ 110.) After the indictment, however, City officials attempted to downplay the magnitude of Watts's criminal enterprise. (*Id*. ¶¶ 114–15.) Furthermore, according to Plaintiffs, a "code of silence" enforced throughout the CPD taught officers to conceal each other's misconduct. (*Id*. ¶¶ 116–17.) Those who violated the code faced serious penalties: officers who cooperated with the FBI investigation of Watts's team endured retaliation and threats to their lives. (*Id*. ¶¶ 117–18, 120, 123–24.) Moreover, Watts and a CPD supervisory officer told another officer who confronted Watts about his misconduct that the officer's life was in danger if he did not "keep his mouth shut." (*Id*. ¶¶ 126–29.) The City never investigated Defendant Officers despite a clear pattern of misconduct; instead, the City deferred to the FBI investigation. (*Id*. ¶¶ 134–36.) Despite having reason to believe that Watts's team was committing crimes, the City allowed the abuse to occur and withheld information about the misconduct. (*Id*. ¶¶ 138–40.) During the relevant time, Defendants Karen Rowan and Debra Kirby served as Assistant Deputy Superintendents of the CPD, and Philip J. Cline served as Superintendent of the CPD.[4] (*Id*. ¶¶ 13–15.)

Baker filed a post-conviction petition after Watts and Mohammed were "publicly exposed as criminals." (*Id*. ¶¶ 141–42.) After the charges relating to Baker's March 2005 arrest were dismissed on January 14, 2016, both Baker and Glenn sought to overturn their guilty pleas

---

[4] Rowan, Kirby, and Cline are referred to herein, collectively, as "Defendant Supervisory Officers."

relating to the December 2005 arrest. (*Id.* ¶¶ 143–44.) The Circuit Court of Cook County vacated both convictions on March 23, 2016. (*Id.* ¶ 145.) After their convictions were vacated, Plaintiffs filed this suit against Defendant Officers, Defendant Supervisory Officers, and the City on September 15, 2016.

## DISCUSSION

Defendants have moved to dismiss the entire FAC pursuant to Rule 12(b)(6) for failure to state a claim. Such a motion challenges the sufficiency of the complaint, not its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff must provide "only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (internal quotation marks and citation omitted). But while a complaint need not include detailed factual allegations, the plaintiff nonetheless must plead "'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *McReynolds v. Merrill Lynch & Co., Inc.,* 694 F.3d 873, 885 (7th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).

I.      **Due Process and Malicious Prosecution Claims**

A.      **Federal Due Process Claims (Count I)**

In Count I, Plaintiffs assert federal due process claims based on the Fourteenth Amendment. Specifically, Plaintiffs allege that Defendant Officers fabricated evidence and withheld exculpatory evidence for the purpose of framing Plaintiffs and ensuring their

convictions, thereby violating their due process rights. In addition, according to Plaintiffs, Defendant Supervisory Officers knew about a pattern of such misconduct by Defendant Officers yet deliberately allowed those officers to continue their abuses, placing Plaintiffs and others at risk of having their rights violated. In seeking dismissal of Plaintiffs' due process claims, Defendants argue that Plaintiffs are effectively alleging improper federal malicious prosecution claims, and further, that silence with respect to evidence fabrication does not constitute an actionable claim under *Brady v. Maryland*, 373 U.S. 83 (1963).

Courts in this Circuit recognize a standalone federal due process claim for evidence fabrication—separate and apart from any malicious prosecution claim—when fabricated evidence is used to obtain a wrongful conviction or deprive a person of his liberty. *See Avery v. City of Milwaukee*, 847 F.3d 433, 441 (7th Cir. 2017); *see also Saunders-El v. Rohde*, 778 F.3d 556, 559–60 (7th Cir. 2015) (finding that the district court erred in concluding categorically that allegations of evidence fabrication cannot form the basis for a federal due process claim); *Petty v. City of Chicago*, 754 F.3d 416, 422–23 (7th Cir. 2014) (explaining the difference between an evidence fabrication claim, which may form the basis for a due process violation, and a coercion claim, which may not); *see also Whitlock v. Brueggeman*, 682 F.3d 567, 580 (7th Cir. 2012) ("We have  consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way.").

Based on the allegations in the FAC, Plaintiffs have sufficiently pleaded due process violations based on fabrication of evidence. Plaintiffs allege that Defendant Officers planted drugs on Plaintiffs' property and persons and falsified police reports stating that Plaintiffs were found in possession of drugs, in order to frame Plaintiffs for crimes they did not commit.

Fabricated evidence was presented at Baker's trial where he was convicted on charges stemming from his March 2005 arrest, and fabricated evidence compelled Baker and Glenn to plead guilty to charges stemming from their December 2005 arrests. Under Seventh Circuit precedent, such allegations state valid claims for due process violations wholly apart from any purported *Brady* violations for failure to disclose the fabrication. As the Seventh Circuit explained in differentiating claims of evidence fabrication from claims of coerced testimony:

> Armed with the *Brady* disclosure, the accused can impeach the coerced testimony by pointing to the tactics the officers used to extract it, and the jury has a fair opportunity to find the truth.
>
> The same cannot be said for fabricated evidence. Falsified evidence will ***never*** help a jury perform its essential truth-seeking function. That is why convictions premised on deliberately falsified evidence will always violate the defendant's right to due process. What's relevant is not the label on the claim, but whether the officers created evidence that ***they knew to be false***.

*Avery*, 847 F.3d at 439–40 (internal quotation marks and citation omitted). In short, it does not matter whether Plaintiffs label their due process claims as "evidence fabrication" claims, *Brady* violations, or something else. Defendant Officers allegedly created evidence they knew to be false and then used that evidence to secure Plaintiffs' convictions for crimes they did not commit. These allegations are sufficient to support actionable due process claims.

Plaintiffs also suggest a *Brady* theory for their due process claims. A police officer's failure to disclose material exculpatory evidence to a criminal defendant or the prosecutor may result in a violation of the defendant's due process rights. *See Brady*, 373 U.S. at 87–88 (explaining that the state violates the constitutional due process requirement by failing to disclose material exculpatory evidence to defendants); *Harris v. Kuba*¸ 486 F.3d 1010, 1014 (7th Cir. 2007) (explaining that police must disclose exculpatory evidence to prosecutors). To establish a *Brady* claim against officers, a plaintiff must show (1) the evidence at issue was

favorable to the plaintiff; (2) the officers concealed the evidence; and (3) the concealed evidence resulted in prejudice to the plaintiff. *Harris*, 486 F.3d at 1014. A *Brady* violation may provide the basis for a due process claim when officers fail to disclose exculpatory evidence that the plaintiff needs to impeach fabricated evidence at trial. *See Avery*, 847 F.3d at 443. This is so even if the plaintiff knew that the evidence was fabricated. That the plaintiff knew evidence was fabricated at the time does not preclude a *Brady*-based due process claim if the officers failed to disclose circumstances pertaining to the fabrication that would have enabled the plaintiff to challenge the validity of the evidence at trial. *Id.*

To the extent Plaintiffs intend to present their due process claims under a *Brady* theory, they have alleged enough to proceed past the pleadings stage. Plaintiffs allege that Defendants withheld evidence that Watts and his team planted drugs and falsified police reports, as well as information about those officers' "pattern of misdeeds" in the form of citizen complaints of misconduct. It is reasonable to infer that Plaintiffs could have used this information to impeach the state's evidence against them. Without it, Plaintiffs had to rely only on their own denials that they possessed drugs without support for any other explanation as to why drugs were found in their possession. Drawing all inferences in Plaintiffs' favor, it is reasonable to infer that knowledge of Watts's and the other officers' misdeeds would have cast sufficient doubt upon the evidence in Plaintiffs' cases that the outcomes would have been different. Baker's trial on charges stemming from his March 2005 arrest might have ended in an acquittal, and both Plaintiffs would have been on better footing to refuse a plea deal, go to trial, and obtain acquittals with respect to the charges stemming from the December 2005 arrests.

Defendants contend that they are entitled to qualified immunity as to any claims based on a *Brady* violation. They offer three reasons. First, Defendants contend that because police officers have no constitutional duty to disclose their own misconduct, any alleged failure by Defendants to disclose the fabricated evidence against Plaintiffs did not violate a clearly established constitutional right. Second, Defendants argue that they are entitled to qualified immunity with respect to any failure to disclose prior bad acts of Defendant Officers who did not testify at Baker's 2006 trial. And finally, Defendants assert that *Brady* does not impose disclosure requirements in connection with guilty pleas, and thus Defendants are entitled to qualified immunity in connection with Plaintiffs' claims arising out of the convictions arising out of the December 2005 arrests.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Lewis v. City of Chicago*, 914 F.3d 472, 477 (7th Cir. 2019) (*quoting Kisela v. Hughes*, 138 S. Ct. 1148, 1151 (2018) (per curiam)). To determine whether qualified immunity applies, the Court undertakes a two-part inquiry: first, whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and second, whether that right was clearly established at the time of the defendant's alleged misconduct. *Id.* It is rare, however, for a complaint to be dismissed on qualified immunity grounds under Rule 12(b)(6) because the defense frequently depends heavily on the facts of the particular case, and plaintiffs are not required to anticipate and overcome the qualified immunity defense in their pleadings. *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018); *see also Hanson v. LeVan*, 967 F.3d 584, 589 (7th Cir. 2020).

In this case, the Court agrees with Plaintiffs that qualified immunity cannot be decided at the pleadings stage. On a Rule 12(b)(6) motion, qualified immunity must be considered taking Plaintiffs' well-pleaded allegations as true. *Hanson*, 967 F.3d at 590. "A complaint may be dismissed under Rule 12(b)(6) on qualified immunity grounds where the plaintiff asserts the violation of a broad constitutional right that had not been articulated at the time the violation is alleged to have occurred." *Id.* at 590 (citing *Reed*, 906 F.3d at 548.) But here, a reasonable person would have known at the time that failure to disclose material exculpatory evidence to a criminal defendant violated a clearly established constitutional right of that defendant. *See Brady*, 373 U.S. at 87–88. As the broad constitutional right had been articulated at the time of the violation, the qualified immunity inquiry requires a closer examination of the facts to determine whether a reasonable person would have known that his conduct violated a clearly established right under the circumstances of this case. *See Whitlock*, 682 F.3d at 575–76. In particular, qualified immunity in this case likely turns on details regarding the contents of the withheld evidence that are not yet part of the evidentiary record. Plaintiffs are entitled to develop a record as to the circumstances surrounding the evidence fabrication so that they may argue what information they could have used in defense of the criminal charges, how they would have used that evidence, and whether it would have had an impact on their convictions. Similarly, whether or not the exculpatory evidence would have been admissible at trial is not a matter to be determined on the pleadings. Again, as qualified immunity constitutes an affirmative defense, Plaintiffs were not required to plead around it in their FAC.

For all the reasons stated above, Defendants' motion to dismiss is denied as to Count I.

### B. Federal Malicious Prosecution Claims (Count II)

In Count II, Plaintiffs assert federal malicious prosecution claims based on the Fourth Amendment. In response to Defendants' motion to dismiss, Plaintiffs acknowledge that Seventh Circuit precedent at the time they filed this action precluded these claims. But according to Plaintiffs, the Supreme Court overturned that precedent in *Manuel v. City of Joliet, Illinois*, 137 S. Ct. 911 (2017), thus opening the door for their federal malicious prosecution claims to proceed.

Despite Plaintiffs' suggestion to the contrary, however, *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), plainly bars any federal claims that sound in malicious prosecution where, as here, there is an adequate state law remedy. *See id.* at 750 (explaining that "the existence of a tort claim under state law knocks out any constitutional theory of malicious prosecution"); *see also Saunders-El*, 778 F.3d at 560 (reiterating that *Newsome* establishes that allegations sounding in malicious prosecution must be brought pursuant to state law). Neither the Supreme Court nor the Seventh Circuit has disturbed that status quo with more recent rulings. While it is true that the Supreme Court in *Manuel* partially abrogated *Newsome* in finding that the Fourth Amendment can support a claim for unlawful pretrial detention beyond the start of legal process*, see Manuel*, 137 S. Ct. at 916, *Newsome's* conclusions regarding the viability of federal malicious prosecution claims remain good law in this Circuit. *See, e.g., Lewis*, 914 F.3d at 479; *Seymour v. Vill. of Glenview*, No. 18 C 6174, 2019 WL 1505411, at *4 (N.D. Ill. April 5, 2019) (dismissing Fourth Amendment malicious prosecution claim because "there is no such thing"); *Lattimore v. Klein*, No. 17-cv-8683, 2019 WL 1028121, at *4 (N.D. Ill. March 4, 2019) ("As the Supreme Court and Seventh Circuit have now made clear, however, there is no such thing as a 'Fourth Amendment malicious prosecution' claim. Rather, to the extent that the plaintiffs allege that they

11

were detained in custody based on fabricated evidence . . . they have a Fourth Amendment claim for a seizure unsupported by probable cause, not a 'malicious prosecution' claim."); *Andersen v. Vill. of Glenview*, No. 17-cv-05761, 2018 WL 6192171, at *13 (N.D. Ill. Nov. 28, 2018) (rejecting any federal malicious prosecution claim under the Fourth or Fourteenth Amendment because "as the Seventh Circuit has repeatedly explained, there is no free-standing constitutional tort of malicious prosecution") (internal quotation marks omitted). Accordingly, Plaintiffs cannot proceed with their federal malicious prosecution claims in Count II. Those claims are dismissed.

### C. State Law Malicious Prosecution Claim (Count VI)

Plaintiffs assert state law claims for malicious prosecution in Count VI. To succeed on a malicious prosecution claim in Illinois, a plaintiff must show: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause; (4) malice; and (5) damages." *Szczesniak v. CJC Auto Parts, Inc.*, 21 N.E.3d 486, 490 (Ill. App. Ct. 2014).

In this case, Plaintiffs allege that Defendant Officers caused them to be prosecuted by providing false reports and falsely claiming that there was probable cause to arrest them, thus satisfying the first and third elements of their state law malicious prosecution claims. (*See* Compl. ¶¶ 48, 54, 78–80.) The Circuit Court of Cook County vacated Baker's and Glenn's convictions on January 14, 2016 and March 23, 2016, satisfying the second element. (*Id*. ¶ 145.) The Court may reasonably infer malice from the allegations regarding Defendant Officers' statements and actions—Plaintiffs allege that Defendant Officers framed Plaintiffs in retaliation for their complaints and Baker's refusal to pay a bribe. (*Id*. ¶ 83.) Additionally, both Plaintiffs purport to have been threatened by various police officers for failing to pay the demanded bribe

and making complaints against Defendant Officers. (*Id.* ¶¶ 45, 52, 70.) Plaintiffs also allege that they suffered damages in the form of loss of liberty, as well as physical and emotional suffering. (*Id.* ¶ 234.) These allegations are sufficient at the pleading stage to sustain state law claims for malicious prosecution.

Defendants assert that any claims based on the July 2004 arrest are hopelessly time-barred because Baker's 2004 trial stemming from that arrest did not end in a conviction. *See, e.g., Anderson v. Catholic Bishop of Chi.*, 759 F.3d 645, 648–49, 651–53) (7th Cir. 2014).[5] Under Illinois law, a malicious prosecution claim accrues when the underlying criminal proceeding terminates in the plaintiff's favor. *See Ferguson v. City of Chicago*, 820 N.E.2d 455, 459 (Ill. 2004). And so Defendants are correct in noting that if Plaintiffs were pursuing malicious prosecution claims based on charges from Baker's July 2004 arrest, those claims would likely be time-barred. But Plaintiffs are not pursuing malicious prosecution claims based on the July 2004 arrest. Plaintiffs' claims instead originate from the March 2005 and December 2005 arrests— which led to convictions that were vacated in January 2016 and March 2016. As Plaintiffs filed this lawsuit on September 15, 2016—*i.e.*, less than one year after the criminal proceedings were terminated in their favor—their state law malicious prosecution claims were timely filed.

Since Plaintiffs have adequately pleaded state law claims for malicious prosecution and those claims are not time-barred, the Court denies Defendants' motion to dismiss Count VI.

---

[5] Because a plaintiff's failure to file a lawsuit within the limitations period constitutes an affirmative defense, a Rule 12(b)(6) motion is not usually the proper vehicle for raising such an argument. *See Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613 (7th Cir. 2014) (citing *United States v. N. Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004)). But a court may grant a motion to dismiss on statute of limitations grounds when a plaintiff pleads facts effectively establishing the defense. *Hollander v. Brown*, 457 F.3d 688, 691 n.1 (7th Cir. 2006).

## II.     First Amendment Claims (Count III)

In Count III, Plaintiffs assert First Amendment retaliation claims. Specifically, Plaintiffs claim that Defendant Officers framed and arrested them in retaliation for Plaintiffs' attempts to expose Defendant Officers' misconduct. "An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). To plead a *prima facie* case of First Amendment retaliation, Plaintiffs must allege that (1) they engaged in constitutionally protected activity, in this case, speech; (2) but for the protected speech, Defendant Officers would not have taken the alleged retaliatory action against them; and (3) Plaintiffs suffered a deprivation likely to deter future First Amendment activity. *See Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 501 (7th Cir. 2010). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).

Defendants advance a single argument for dismissal of Plaintiffs' First Amendment claims: the claims are time-barred. Since the statute of limitations provides an affirmative defense, the complaint must plainly reveal that an action is untimely before a court will grant dismissal based on a Rule 12(b)(6) motion. *See Leavell v. Kieffer*, 189 F.3d 492, 495 (7th Cir. 1999). In Illinois, the limitations period for § 1983 claims is two years. *Draper v. Martin*, 664 F.3d 1110, 1113 (7th Cir. 2011). Moreover, the statute of limitations for First Amendment retaliation claims generally begins to run immediately following the alleged retaliatory act. *See Gekas v. Vasiliades*, 814 F.3d 890, 894 (7th Cir. 2016). Given that the alleged retaliatory acts in this case occurred in 2004 and 2005, Plaintiffs' First Amendment claims would be time-barred if

14

the statute of limitations began to run at the time of the arrests. Plaintiffs contend, however, that their claims did not accrue until their convictions were vacated, citing the deferred-accrual rule of *Heck v. Humphrey*, 512 U.S. 477 (1994).

"*Heck* holds that a plaintiff may not maintain a § 1983 action where a judgment in his favor would necessarily imply the invalidity of a previous criminal conviction that has not been reversed, expunged, or called into question by the issuance of a federal court writ of habeas corpus." *McCann v. Neilsen*, 466 F.3d 619, 621 (7th Cir. 2006) (*citing Heck*, 512 U.S. at 487). Thus, "a claim that implies the invalidity of a criminal conviction does not accrue, and the statute of limitations does not begin to run, until the conviction is set aside by the judiciary or the defendant receives a pardon." *Moore v. Burge*, 771 F.3d 444, 446 (7th Cir. 2014); *see id.* (explaining that, to the extent the plaintiffs argued that police violated their rights by giving false testimony, or that during trial prosecutors withheld material exculpatory evidence about misconduct during their interrogations, *Heck* bars relief until the conviction is set aside). Notably, *Heck*'s deferred-accrual rule only applies to claims that imply the invalidity of a criminal conviction; thus, "claims based on out-of-court events, such as the gathering of evidence, accrue as soon as the constitutional violation occurs." *Id.* at 446. *See also Wallace v. Kato*, 549 U.S. 384, 396 (2007) (holding that "the statute of limitations upon a § 1983 claim seeking damages for false arrest in violation of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process); *Rosado v. Gonzalez*, 832 F.3d 714, 716 (7th Cir. 2016) (*citing Wallace*); *Neita v. City of Chicago*, 830 F.3d 494, 498 (7th Cir. 2016); *Parish v. City of Elkhart*, 614 F.3d 677, 681 (7th Cir. 2010).

Here, however, Plaintiffs claim that Defendant Officers retaliated against them by framing them for crimes they did not commit and using fabricated evidence to secure wrongful convictions. Thus, Plaintiffs' First Amendment claims rest on the fundamental assertion that they did not possess any drugs and therefore were not guilty of the offenses of conviction. There is no way for Plaintiffs to plead their First Amendment claims—let alone prove those claims—without attacking the validity of their convictions. *See Van Gilder v. Baker*, 435 F.3d 689, 691 (7th Cir. 2006) ("To properly apply *Heck*'s bar against certain damage actions, a district court must analyze the relationship between the plaintiff's § 1983 claim and the charge on which he was convicted."); *see also Calabrese v. Fox*, 338 F.Supp.3d 775, 790 (N.D. Ill. 2017) (explaining that, while not all false arrest claims are barred by *Heck*, the bar does apply to false arrest claims where "'specific factual allegations in the complaint are necessarily inconsistent with the validity of the conviction'") (*quoting McCann*, 466 F.3d at 621). Put another way, if Plaintiffs **had** attempted to bring their First Amendment claims while their convictions still stood firm, the claims would have been barred by *Heck*.

Accordingly, the time for Plaintiffs to bring their First Amendment claims did not begin to run until their convictions were vacated in 2016. Count III thus survives Defendants' challenge based on the statute of limitations.

### III.     Failure to Intervene Claims (Count IV)

In Count IV, Plaintiffs assert claims for failure to intervene under § 1983. A state actor's failure to intervene in the commission of a constitutional violation may render him culpable under § 1983 if (1) he knew that the constitutional violation was committed, and (2) he had a realistic opportunity to prevent it. *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).

There must be an underlying constitutional violation for there to be a failure to intervene. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005).

Defendants' argument for dismissal of Plaintiffs' failure to intervene claims rests on the proposition that Plaintiffs cannot establish an underlying constitutional violation. As discussed above, however, the Court finds that Plaintiffs have stated due process and First Amendment retaliation claims. The Court may reasonably infer from the allegations in the FAC that Defendant Officers and Defendant Supervisory Officers knew that Plaintiffs' constitutional rights were being violated through the fabrication of evidence, including the planting of drugs on Plaintiffs' persons and property and the falsification of police reports, and that Watts and his team regularly engaged in such misconduct. Moreover, Plaintiffs have plausibly alleged that Defendant Officers and Defendant Supervisory Officers had the opportunity to put a stop to the misconduct by refusing to participate or cover it up, by discipling the responsible officers, or by seeking outside help. Yet they failed to do so. The Court therefore denies Defendants' motion to dismiss Count IV.

### IV.    Federal and State Conspiracy Claims (Counts V and VIII)

Plaintiffs assert federal conspiracy claims under § 1983 in Count V and state common law conspiracy claims in Count VII. To state § 1983 conspiracy claims, Plaintiffs must allege facts sufficient to show (1) Defendants reached an agreement to deprive Plaintiffs of their constitutional rights, and (2) overt acts in furtherance of the conspiracy that actually deprived Plaintiffs of those rights. *See Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). Plaintiffs must also allege the parties, the general purpose, and the approximate date of the conspiracy. *Loubser v. Thacker*, 440 F.3d 439, 443 (7th Cir. 2006). Similarly, to plead conspiracy claims successfully under Illinois state law, Plaintiffs must allege: "(1) a combination

of two or more persons; (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means; (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnson*, 807 N.E.2d 461, 470 (Ill. 2004).

In seeking dismissal of their conspiracy claims, Defendants criticize Plaintiffs for relying on what Defendants characterize as simple labels, conclusions, and a formulaic recitation of the elements. The Court disagrees. In fact, Plaintiffs' FAC provides a detailed factual narrative describing how Defendant Officers agreed to plant drugs on Plaintiffs to frame them for crimes, covered up their misconduct by submitting falsified reports, and provided false evidence and testimony with the goal of ensuring that Plaintiffs were convicted and, in Baker's case, imprisoned for crimes they did not commit. Plaintiffs do not merely parrot legal conclusions; rather, they allege with sufficient specificity a conspiracy to punish Baker for refusing to give Watts a bribe and to punish both Baker and Glenn for daring to complain about police misconduct. Viewing the facts and all reasonable inferences in Plaintiffs' favor, they have plausibly alleged both federal and state law conspiracy claims. Defendants' motion to dismiss is thus denied as to Counts V and VIII.

## V. Intentional Infliction of Emotional Distress Claims (Count VII)

In Count VII, Plaintiffs assert state law claims for intentional infliction of emotional distress or "IIED." To state an IIED claim under Illinois law, a plaintiff must allege that "(1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended that his conduct should inflict severe emotional distress, or knew that there was a high probability that his conduct would cause severe emotional distress; [and] (3) the defendant's conduct in fact caused severe emotional distress." *Doe v. Calumet City*, 641 N.E.2d 498, 506 (Ill. 1994)

18

(*overruled on other grounds by DeSmet ex. rel. Estate of Hays v. County of Rock Island*, 848

N.E.2d 1030 (Ill. 2006)). In this case, Plaintiffs allege that Defendant Officers' abuse of their

power and authority as described in the FAC satisfies these elements. For purposes of the present

motion, Defendants do not disagree. Instead, they seek dismissal of the claim based on the statute

of limitations.

The parties agree that the statute of limitations for Plaintiffs' IIED claim is one year. *See*

745 ILCS 10/8-101. As with the First Amendment claims, however, the parties disagree on when

Plaintiffs' IIED claims accrued such that the statute of limitations began to run. Defendants again

contend that the limitations period began to run when Plaintiffs' were arrested by Defendant

Officers; Plaintiffs, on the other hand, argue that under *Heck*, the limitations period did not begin

to run until their convictions were vacated in 2016. *See Moore*, 771 F.3d at 446.

Defendants rely for their position on *Bridewell v. Eberle*, 730 F.3d 672 (7th Cir. 2013). In

*Bridewell*, the Seventh Circuit affirmed the district court's dismissal on statute of limitations

grounds of the plaintiff's IIED claim, explaining that "a claim of intentional infliction of

emotional distress in the course of arrest and prosecution accrues on the date of the arrest." *Id.* at

678. But the *Bridewell* court was not asked to address the *Heck* bar, as the plaintiff there was not

convicted. And several courts in this District have since concluded that when an IIED claim is

based on the same misconduct that procured the plaintiff's conviction, the statute of limitations

does not begin to run until the wrongful conviction has been overturned. *See, e.g.*, *Hill v. City of*

*Chicago*, Nos. 19 C 6080 & No. 19 C 6081, 2020 WL 509031, at *5 (N.D. Ill. Jan. 31, 2020);

*Andersen v. City of Chicago*, No. 16-cv-1963, 2019 WL 6327226, at * 6 (N.D. Ill. Nov. 26,

2019); *Brown v. City of Chicago*, No. 18 C 7064, 2019 WL 4694685, at *6 (N.D. Ill. Sept. 26,

2019). *But see Batchelor v. City of Chicago*, No. 18-cv-08513, 2020 WL 509034, at *4 (N.D. Ill.

Jan. 31, 2020); *Friends-Smiley v. City of Chicago*, No. 16-cv-5646, 2016 WL 6092637, at *2 (N.D. Ill. Oct. 19, 2016) (collecting cases).

As alleged, Plaintiffs' IIED claims are based on the very same fabrication of evidence that led to their convictions. Alleging those facts before their convictions were vacated would have directly attacked the validity of the convictions in violation of *Heck*. Accordingly, this Court concurs with others in this District that have found under similar circumstances that a plaintiff cannot bring an IIED claim based on the fabrication of evidence that led to a conviction until that conviction has been overturned. *See Hill*, 2020 WL 509031, at *3 (finding that, because the plaintiffs' wrongful convictions were the crux of their IIED claims, those claims could not be brought until the convictions were overturned; therefore, that is when the statute of limitations began to run); *Andersen*, 2019 WL 6327226, at *6 (finding that the plaintiff's IIED claim directly attacked his conviction and therefore did not accrue until his conviction was overturned). Thus, Plaintiffs' claims did not accrue until January 2016 and March 2016, and were timely filed on September 15, 2016. Defendants' motion to dismiss Count VII is therefore denied.

## VI. Loss of Consortium (Count IX)

Defendants also seek dismissal of Plaintiffs' loss of consortium claims in Count IX. Under Illinois law, when one spouse is injured, the other may recover from the tortfeasor in a separate cause of action for the resulting loss of support, society, and companionship. *See Pease v. Ace Hardware Home Ctr. of Round Lake No. 252c*, 498 N.E.2d 343, 349 (Ill. 1986) (setting out the elements of a loss of consortium claim). Defendants here do not present any argument for dismissal directed toward the substance of Plaintiffs' loss of consortium claims. Instead, Defendants simply contend that because the loss of consortium claims are "derivative" of the other claims and those other claims should be dismissed, the loss of consortium claims should be

dismissed as well. Since the underlying claims have not all been dismissed, the loss of consortium claims survive. The Court thus denies Defendants' motion to dismiss Count IX.

### VII.    Claims against the City

Plaintiffs also seek to hold the City responsible for the actions of Defendant Officers and Defendant Supervisory Officers based on *Monell* and *respondeat superior* theories of liability, and also to impose an indemnification obligation on the City.

### A.    *Monell*

Under *Monell v. Department of Social Services of New York*, a municipality may be held liable under § 1983 only "when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible for under § 1983." 436 U.S. 658, 694 (1978). To state a *Monell* claim, a plaintiff must allege: "(1) that he suffered a constitutional injury, and (2) that the City authorized or maintained a custom of approving the unconstitutional conduct." *Petty*, 754 F.3d at 424.

As discussed above, Plaintiffs have sufficiently alleged constitutional injuries in the forms of due process violations and First Amendment retaliation claims. Moreover, the FAC contains numerous specific factual allegations tending to show that the City authorized or had a custom of approving the unconstitutional conduct. Specifically, Plaintiffs allege that the City and its officials had notice of a widespread practice of misconduct of the very sort suffered by Plaintiffs carried out by its police officers generally, and Watts and his team specifically; nonetheless, the City failed to investigate citizen complaints and abdicated its responsibility to train, supervise, discipline, and control its officers. Plaintiffs also allege that the City authorized and maintained a code of silence across its police department that discouraged officers from revealing misconduct. (*See* FAC ¶ 116–120.) Plaintiffs offer concrete examples of acts of

retaliation committed against Officers Spaulding, Echeverria, and Spaargaren after they attempted to report Watts and his team for their misconduct. (*Id.* ¶¶ 123–25, 128–30.) These allegations are further supported with references to comments by the Police Superintendent at public hearings (*see id.* ¶ 169), data from the City itself (*id.* ¶¶ 175–78), findings by the Committee on Police and Fire of the Chicago City Counsel and Justice Coalition of Greater Chicago (*id.* ¶¶ 170, 171), and examples of criminal prosecutions of other CPD officers (*id.* ¶¶ 181–91).While some of the information alleged likely would not be admissible at trial, it nonetheless bolsters the otherwise well-pleaded allegations that the City maintained an unconstitutional policy or custom. Defendants' motion to dismiss any *Monell*-based claims against the City is accordingly denied.

### B.    *Respondeat Superior* **and Indemnification (Counts X and XI)**

Defendants also seek dismissal of Plaintiffs' claims against the City to the extent those claims are based on a theory of *respondeat superior* or state indemnification law, as set out in Counts X and XI. Defendants contend that because the underlying substantive claims should be dismissed, there is no basis for *respondent superior* recovery or indemnification. Given that the Court has allowed the underlying state law claims to survive, these theories of vicarious relief survive as well. The Court therefore denies Defendants' motion to dismiss to the extent it is directed towards the theories of liability set out in Counts X and XI.

### VIII.   Lack of Personal Involvement

Lastly, Defendants contend that the § 1983 claims against certain Defendant Officers and Defendant Supervisory Officers should be dismissed because the FAC does not adequately allege their personal involvement in the constitutional violations. Indeed, liability under § 1983 requires personal involvement in a constitutional violation by the defendant. *Palmer v. Marion County*,

327 F.3d 588, 594 (7th Cir. 2003). Moreover, "[b]ecause § 1983 does not allow actions against individuals merely for their supervisory role of others, individual liability under 42 U.S.C. § 1983 can only be based on a finding that the defendant caused the deprivation at issue." *Id.* at 594 (internal citations and quotation marks omitted). If a supervisor did not personally engage in the misconduct of his subordinates, then "[t]o be liable, a supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Doe v. Purdue Univ.*, 928 F.3d 652, 664 (7th Cir. 2019) (internal quotation marks and citations omitted).

Defendants argue that the allegations against Defendant Officers Cabrales and Soltis are insufficient to support their personal involvement in the claimed constitutional violations.[6] The Court disagrees. The FAC specifically alleges that Cabrales worked with other Defendant Officers in connection with Baker's March 2005 arrest "to create police reports that were false and contained fabricated statements about Mr. Baker's alleged possession of controlled substances." (FAC ¶ 54.) Meanwhile, Soltis is alleged to have worked with other Defendant Officers "to create false police reports about the [December 2005] arrest to make it appear that Mr. Baker and Ms. Glenn had committed crimes, when, in fact, they had not." (FAC ¶ 80.) It is true that these allegations regarding the two officers' involvement are relatively thin. Accepted as true, however, they are sufficient to establish each officer's personal involvement in the alleged due process violation, conspiracy, and failure to intervene.

Similarly, Defendants contend that the FAC fails to state claims under § 1983 against Defendant Supervisory Officers Cline, Rowan, and Kirby because the allegations do not

---

[6] Defendants raised the same argument as to Defendant Officers Stevens and Griffin prior to their voluntary dismissal from the case.

sufficiently show their personal involvement in any constitutional violations or any other basis to impose liability against them as supervisors.

In response, Plaintiffs do not claim that Defendant Supervisory Officers personally carried out the misconduct surrounding Plaintiffs' arrests and prosecutions. Instead, Plaintiffs seek to hold Defendant Supervisory Officers liable based on a theory that they knew about the misconduct by Watts and his team and facilitated, approved, condoned, or turned a blind eye to it. *See Doe*, 928 F.3d at 664. On this point, Defendants urge the Court to find that Plaintiffs have actually "pleaded themselves out of court" as to their supervisory liability claims. (Def. Joint Mem. in Support of Mot. to Dismiss at 30, Dkt. No. 67.) According to Defendants, the allegations in the FAC establish that Defendant Supervisory Officers knew about the misconduct by Watts and his team, knew about and participated in the FBI's criminal investigation of that conduct, and made a determination to defer conducting their own investigation in light of the FBI's efforts. Accepted as true, Defendants claim, these allegations show that far from being deliberately indifferent to Defendant Officers' misconduct, Defendant Supervisory Officers recognized and combatted the misconduct by supporting and participating in the criminal investigation.

The Court disagrees with Defendants' characterization of the allegations in the FAC against Defendant Supervisory Officers and finds those allegations sufficient at the pleadings stage. The FAC does allege that the FBI investigation "took place with the knowledge and occasional participation of the Chicago Police Department's Internal Affairs Department" and that the Internal Affairs Department "was kept abreast of the FBI investigation." (FAC ¶¶ 102–03.) But, as Plaintiffs point out, far from alleging that CPD officers assisted and participated in a joint investigation with the FBI, the FAC asserts that officers who cooperated with the criminal

investigation suffered severe intimidation, ostracization, and retaliation. (*See, e.g.*, FAC ¶¶ 121–30 (describing instances in which officers who cooperated with the FBI investigation were retaliated against)). The existence of the FBI investigation may influence a factfinder's evaluation of whether Defendant Supervisory Officers in fact facilitated, approved, condoned, or turned a blind eye to misconduct by Watts and his team. But a criminal investigation by an outside agency serves a very different purpose than internal discipline, training, and review. Perhaps a jury ultimately will agree with Defendants that Defendant Supervisory Officers acted within constitutional bounds by deferring to the FBI investigation. But that determination will likely turn on facts beyond the pleadings—including evidence establishing exactly what Defendant Supervisory Officers Cline, Rowan, and Kirby knew about Watts's team's conduct, when they knew it, and what they could have done about it.[7] With a more developed record at the summary judgment stage or trial, Defendants ultimately may be proved correct in their characterization of Defendant Supervisory Officers' actions. But the claims against those officers survive a motion to dismiss.

---

[7] The multitude of factual issues regarding the knowledge and actions of Defendant Supervisory Officers also demonstrates why this is not one of the minority of cases in which qualified immunity can be determined based on the pleadings.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the FAC (Dkt. No. 67) is granted in part and denied in part. The motion is granted with respect to Count II, which is dismissed with prejudice, and otherwise denied.

ENTERED:

Dated:  August 31, 2020

_____
Andrea R. Wood
United States District Judge