1                  IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

| | | |
|---|---|---|
| 3 | IN RE WATTS COORDINATED | ) Master Case No. 19 C 1717 |
| | PRETRIAL PROCEEDINGS | ) |
| 4 | | ) Chicago, Illinois |
| | This Document Relates to | ) June 10, 2024 |
| 5 | Case No. 16 C 8940 | ) 4:08 p.m. |
| 6 | _____ | ) |
| | | ) |
| 7 | BEN BAKER and CLARISSA GLENN, | ) |
| | | ) |
| 8 |         Plaintiffs, | ) |
| | | ) |
| 9 |     v. | ) |
| | | ) |
| 10 | CITY OF CHICAGO, *et al.*, | ) |
| | | ) |
| 11 |         Defendants. | ) |

12     TRANSCRIPT OF PROCEEDINGS - TELEPHONIC RULINGS ON MOTIONS
       BEFORE THE HONORABLE SHEILA M. FINNEGAN, MAGISTRATE JUDGE
13

14   APPEARANCES:

15

16   For the Plaintiffs:  LOEVY & LOEVY
                       BY:  MR. SCOTT R. RAUSCHER
17                          MS. GIANNA GIZZI
                          MR. JOSHUA A. TEPFER
18                 311 N. Aberdeen Street, 3rd Floor
                 Chicago, Illinois 60607

19

20                 LAW OFFICES OF KENNETH N. FLAXMAN PC
                 BY:  MR. JOEL A. FLAXMAN
21                 200 S. Michigan Avenue, Suite 201
                 Chicago, Illinois 60604

22

23   For the Individual  HALE & MONICO LLC
   Officer Defendants:  BY:  MR. WILLIAM E. BAZAREK
24                     MS. KELLY M. OLIVIER
                     MR. JASON M. MARX
25                 53 W. Jackson Boulevard, Suite 330
                 Chicago, Illinois 60604

```
 1    APPEARANCES (Cont'd.):

 2

 3    For Defendants           LEINENWEBER BARONI & DAFFADA LLC
      Matthew Cadman and       BY:  MR. MICHAEL J. SCHALKA
 4    Michael Spaargaren:      120 N. LaSalle Street, Suite 2000
                               Chicago, Illinois 60602

 5

 6    For Defendant            MOHAN GROBLE SCOLARO PC
      Kallatt Mohammed:        BY:  MR. ERIC S. PALLES
                                    MR. SEAN M. SULLIVAN
 7                             55 W. Monroe Street, Suite 1600
                               Chicago, Illinois 60603

 8

 9    For Defendant            JOHNSON & BELL LTD.
      Ronald Watts:            BY:  MR. BRIAN P. GAINER
10                             33 W. Monroe Street, Suite 2700
                               Chicago, Illinois 60603

11

12    For Defendants           BURNS NOLAND LLP
      City of Chicago,         BY:  MR. DANIEL M. NOLAND
13    Philip Cline, Debra           MR. TERRENCE M. BURNS
      Kirby and Karen               MR. PAUL A. MICHALIK
14    Rowan:                   311 S. Wacker Drive, Suite 5200
                               Chicago, Illinois 60606

15

16    For Defendant            BORKAN & SCAHILL LTD.
      Calvin Ridgell:          BY:  MR. TIMOTHY P. SCAHILL
17                             20 S. Clark Street, Suite 1700
                               Chicago, Illinois 60603

18

19    Court Reporter:          LAURA R. RENKE, CSR, RDR, CRR
                               Official Court Reporter
20                             219 S. Dearborn Street, Room 1224
                               Chicago, Illinois 60604
21                             312.435.6053
                               laura_renke@ilnd.uscourts.gov

22

23

24                     * * * * *
               PROCEEDINGS REPORTED BY STENOTYPE
25    TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

1    (Proceedings heard via telephone:)

2    THE COURT:  Mr. White, please call the case.

3    THE CLERK:  Case 19 CV 1717, Watts Coordinated

4    Pretrial Proceedings, here for status.

5    May I have the Loevy -- counsel for the Loevy

6    plaintiffs, please state your name.

7    MR. RAUSCHER:  Scott Rauscher, Gianna Gizzi, and Josh

8    Tepfer for the Loevy plaintiffs.

9    THE CLERK:  Thank you.

10    Counsel for the Flaxman plaintiffs.

11    MR. FLAXMAN:  Joel Flaxman for the Flaxman plaintiffs.

12    THE CLERK:  Counsel for Spaargaren and Cadman.

13    MR. SCHALKA:  Michael Schalka on behalf of defendants

14    Spaargaren and Cadman.

15    THE CLERK:  Counsel for the individual defendant

16    officers.

17    MR. BAZAREK:  William Bazarek, along with Kelly

18    Olivier and Jason Marx.

19    THE CLERK:  Counsel for defendant Mohammed.

20    MR. PALLES:  Eric Palles and Sean Sullivan.

21    THE CLERK:  Counsel for defendant Watts.

22    MR. GAINER:  Brian Gainer.

23    THE CLERK:  Counsel for defendant City of Chicago.

24    MR. NOLAND:  Daniel Noland and Terry Burns.

25    MR. MICHALIK:  And Paul Michalik as well.

1          THE CLERK:  Okay.  Anybody else?

2          MR. SCAHILL:  Tim Scahill for defendant Ridgell.

3          THE COURT:  All right.  Good afternoon, everyone.

4    This is Judge Finnegan.  As you know, I set this hearing by

5    telephone so I can give you rulings on some outstanding motions

6    that I'm not going to write on, so this will take some time.

7          I'm going to first go through the disputes over the

8    Gerard Baker and Bryant Patrick depositions, then I'm going to

9    turn to the dispute over the defendants' request for an IME of

10   plaintiff Clarissa Glenn, and then I'll turn to the defendants'

11   motion for forensic testing.

12         So starting with the dispute raised in the May 30th,

13   2024, joint status report at Docket 740, the parties disagree

14   on whether defendants should be permitted to depose Gerard

15   Baker, who is the son of Ben Baker, one of the test case

16   plaintiffs, and also non-test case plaintiff Bryant Patrick.

17         I'm going to first give you the ruling on Bryant

18   Patrick.  I am allowing the deposition of Mr. Patrick.  By

19   agreement, the parties can defer that deposition until after

20   his release from prison.

21         As you know, Patrick has his own lawsuit in the

22   consolidated Watts proceedings, but it's not one of the test

23   cases.  While plaintiffs argue that it's too late to take his

24   deposition now in relation to the test cases, namely, the Ben

25   Baker case, defendants did ask for that deposition well before

1     the close of fact discovery in the test cases following the

2     deposition of Ben Baker.

3          And Patrick's name has been included on the list of

4     witnesses to be deposed attached to the monthly joint status

5     report.  It was only in the most recent report on May 30th that

6     the parties decided to present this dispute to me.

7          Defendants say there was an agreement that Patrick

8     would be deposed, but plaintiffs say this was based on a

9     misunderstanding of the purpose of his testimony and plaintiffs

10    now question the relevancy of the testimony that defendants

11    hope to get from Patrick at his deposition.

12         It will be for Judge Valderrama to rule on

13    admissibility of evidence.  For purposes of discovery,

14    defendants were sufficiently able to articulate the relevancy

15    given Baker's anticipated testimony that he stopped selling

16    drugs sometime in 2004 or 2005, which is when the alleged false

17    arrests happened, I guess in 2005.

18         Baker also reportedly testified during his deposition

19    that Patrick was one of the two main people who sold drugs for

20    his operation at Ida B. Wells, so defendants believe he will

21    provide evidence that the drug operation had not stopped.

22         As a practical matter, Patrick must be deposed anyway

23    in his own case.  And as I informed all counsel some time ago,

24    the current stay of fact discovery in the non-test cases will

25    be lifted on September 30th, 2024, so he certainly could be

1    deposed at that time, in any event.

2          Under all these circumstances, I'm exercising my

3    discretion to allow the deposition of Mr. Patrick over

4    plaintiffs' objection.

5          As for Gerard Baker, I am not allowing his deposition

6    to be taken.

7          Gerard Baker is one of Ben Baker's three sons.  The

8    other two sons already have been deposed as they were listed by

9    plaintiffs as damages witnesses.  Initially Gerard Baker was

10   also listed as a damages witness, but plaintiffs removed him

11   well before the December 18, 2023, fact discovery deadline.  So

12   plaintiffs will not be calling Gerard as a damages witness and

13   would be foreclosed from doing so based on their removal of him

14   from the list of damages witnesses.

15         Plaintiffs argue it's too late to depose Gerard Baker

16   since it is past the December 18, 2023, fact discovery deadline

17   in the test cases.  I agree.  I went back over the relevant

18   motions, orders, and joint status reports and even read the

19   transcript of the hearing on January 10, 2024.

20         What is most pertinent here is that defendants filed a

21   motion on November 21, 2023, to extend the December 18, 2023,

22   fact discovery deadline in the test cases by six months to

23   June 30, 2024.  That motion was Docket 614.  Attached to the

24   motion was a spreadsheet that listed each of the witnesses from

25   plaintiffs' disclosures who had been disclosed as potential

1    trial witnesses in the test cases.

2         That spreadsheet also identified 25 additional people

3    who plaintiffs had not disclosed as witnesses but who

4    defendants anticipated deposing.  Gerard Baker was on that list

5    of additional witnesses, though the spreadsheet didn't say what

6    he would testify on even generally, and there was no discussion

7    of him in defendants' motion.

8         Plaintiffs filed a response to the motion.  That was

9    Docket 617.  And they specifically discussed Gerard Baker,

10   stating, "Defendants acknowledge that they are seeking to

11   depose approximately 25 witnesses who Plaintiffs did not

12   disclose.  As noted above, some of those witnesses have not

13   been disclosed by any party, and it is difficult to see what

14   relevant information they might have.  Defendants' request for

15   these depositions is a perfect example of how they are refusing

16   to make reasonable litigation choices that would allow the

17   parties to finish these cases.

18        "For example," and then they skip ahead, "they also

19   continue to seek the deposition of one of Ben Baker's sons,

20   Gerard Baker, despite the fact that Plaintiffs withdrew him as

21   a witness long ago.  Before he was withdrawn, Gerard Baker was

22   disclosed as a damages witness.  Defendants likely want to

23   depose him about Mr. Baker's 2017 arrest, which is unrelated to

24   Ben Baker's lawsuit and completely unnecessary."

25        After hearing argument on the defendants' motion to

1    extend on November 29 and reviewing the supplements that were

2    requested during that hearing and then filed by the parties, I

3    issued my ruling on January 10th, 2024.  I granted the

4    six-month extension only in part.  Over plaintiffs' objection,

5    I extended the deadline for damages witnesses "already

6    identified and not withdrawn by Plaintiffs."

7            Gerard Baker didn't fall into that category, nor did

8    he fall under the few other categories of depositions for which

9    discovery was extended.

10           My January 10th, 2024, order concluded by saying, "In

11   all other respects, Defendants' motion for extension of time to

12   take further discovery is denied absent an agreement to the

13   late discovery."  And that's Docket 657.

14           I directed the parties to prepare a list of the

15   individuals who they expected to depose pursuant to that order

16   and my November 8th, 2023, order that extended some discovery

17   and then to include the list as an attachment to each future

18   joint status report, indicating the status of each deposition.

19   And the next one was due February 12th.

20           During that hearing, after I issued the ruling that is

21   on January 10th, 2024, plaintiffs' counsel Mr. Rauscher said he

22   wanted to ask about one specific person, Gerard Baker, who he

23   didn't think qualified as a damages witness.  He said, "We

24   withdrew him.  I think they tried to serve him toward the very

25   end of discovery and weren't successful.  I don't think he

1    falls into any category."

2         I responded, "Well, you'll talk.  If there's a

3    dispute, let me know."  And I said, "So I am allowing for

4    damage witnesses, but they have to be the ones that have been

5    identified, and the parties have to confer on the schedule."

6         The parties finally did confer about this issue and

7    they did not resolve their dispute, so they provided their

8    respective positions in the May 30th, 2024, joint status

9    report.

10        Now that I've reviewed that joint status report, heard

11   arguments, and reviewed the prior orders, filings, and my

12   January 10 -- the transcript from the January 10, 2024,

13   hearing, I agree with plaintiffs' position that it is too late

14   to depose Gerard Baker based on my January 10th order.  That

15   deposition had to be done by December 18, 2023.

16        As I said, plaintiffs specifically argued in their

17   opposition to the motion to extend that it was too late to

18   depose Gerard Baker and that his testimony was irrelevant.  My

19   order denied the motion to extend time in all respects except

20   those identified in the order, and Gerard Baker was not

21   covered.

22        In seeking to take the deposition now, defendants

23   argue that Gerard has relevant testimony.  Even assuming he

24   does, the problem is that defendants didn't depose him before

25   the close of fact discovery.  I don't see any justification for

1    deviating from the January 10 order and allowing this

2    particular late deposition, especially when there's so much

3    other fact and expert discovery that is ongoing, not to mention

4    the need to work on *Daubert* motions and other pretrial filings.

5         Finally, plaintiffs point out that at this late stage

6    of the case, there is a significant amount of other ongoing

7    work, so the Court should not deviate from the January 10

8    ruling by making an exception for Gerard Baker.

9         For all of these reasons, I'm exercising my discretion

10   to deny the deposition of Gerard Baker over defendants'

11   objection.

12        All right.  I'm going to pause before I turn to the

13   next motion.  If either side has a question or need for

14   clarification, go ahead and speak up now.

15   (No response.)

16        THE COURT:  All right.  I'm turning now to defendants'

17   joint motion for Rule 35 examination of plaintiff Clarissa

18   Glenn and limited extension of expert discovery, Docket 725.

19   I'm granting this motion, both for the IME and for a limited

20   extension of expert discovery to complete that, with some

21   caveats.

22        Federal Rule of Civil Procedure 35 states that a Court

23   "may order a party whose mental or physical condition ... is in

24   controversy to submit to a physical or mental examination by a

25   suitably licensed or certified examiner."  The order "must

1  specify the time, place, manner, conditions, and scope of the

2  examination, as well as the person or persons who will perform

3  it."

4         Ms. Glenn opposes the motion, arguing that while her

5  mental health is in controversy, defendants cannot establish

6  good cause at this stage of the case to further upend the

7  Court-ordered schedule and to force Ms. Glenn to another round

8  of invasive questioning on top of her three depositions and to

9  essentially relive her trauma, which would take an immense toll

10  on her.  In other words, Ms. Glenn argues that there's neither

11  good cause for the Rule 35 exam nor good cause to extend the

12  expert discovery deadline to allow for that exam.

13         I don't doubt that undergoing an IME can take a toll

14  on a person and be invasive.  And I understand Ms. Glenn has

15  already been deposed at great length and was very emotional

16  during portions of her depositions and found the process to be

17  traumatic.

18         But that isn't a sufficient basis to deny an IME in a

19  case like this where Ms. Glenn has filed a lawsuit alleging

20  severe emotional distress and intentional infliction of

21  emotional distress and has been treated for PTSD and testified

22  on February 28, 2024, about serious physical manifestations of

23  anxiety, including panic attacks, lack of sleep, lack of taking

24  care of her family, depression.  Her brother I believe

25  testified also in February about dark periods and talking about

1    suicide at one point.

2         Given the allegations, the anticipated evidence, and

3    the damages that are sought, there is good cause for an IME.

4    Dr. Klipfel will be conducting it.  And she is a licensed

5    psychologist who specializes in treating and assessing

6    individuals who have undergone trauma, so I would expect the

7    testing and any questioning to be done in a professional

8    manner.

9         The closer question is whether the request for the IME

10   was untimely so should be denied on that basis.  Ms. Glenn says

11   her mental health has been in controversy since the outset of

12   the case, as she has always alleged the claims that I described

13   a minute ago, and so they argue defendants -- or she argues

14   defendants should have requested and taken a Rule 35 exam

15   during fact discovery.

16        But Glenn bears herself much of the blame for the

17   delay because she waited until after the close of discovery to

18   disclose some very important information, namely, that contrary

19   to what she said in her discovery responses -- that is, that

20   she had not received any treatment for her mental health

21   issues -- that she actually did receive treatment from a

22   professional.  Not only that, but that professional had

23   diagnosed her with PTSD due to the actions of the defendants in

24   this case.

25        I'm going to quickly walk through the chronology to

1    just demonstrate why, in my view, I cannot fault defendants for

2    failing to seek an IME prior to the December 18, 2023, close of

3    fact discovery or earlier than they did, in fact, do it.

4          First, on August 11, 2021, Ms. Glenn responded to

5    interrogatories, stating, "She has not seen a medical

6    professional for her mental health injuries and she has not

7    received medical treatment for those injuries."

8          On June 6, 2022, Glenn received treatment from Shairee

9    Lackey, LCPC, in two visits and was diagnosed with PTSD.

10   Ms. Glenn did not update her answers to interrogatories or

11   otherwise disclose that treatment and diagnosis for more than

12   two years after that.

13         In the interim, Judge Valderrama entered an order in

14   August 2023 setting the Baker/Glenn case for trial in

15   January 2025 and setting a compressed schedule for *Daubert* and

16   dispositive motions and other pretrial matters to ensure the

17   case would be ready for trial.

18         The following month, on September 20, 2023, Ms. Glenn

19   was deposed.  And she still had not by then supplemented her

20   discovery responses to indicate that she had not only been

21   treated but was diagnosed with PTSD, and she had not otherwise

22   disclosed that treatment and diagnosis.

23         Fast-forward another three months to December 18,

24   2023, when fact discovery closed in the test cases with limited

25   exceptions, yet still by this point Ms. Glenn had not disclosed

1    the medical treatment and diagnosis.

2            A month and a half after the close of fact discovery,

3    on January 31, 2024, Ms. Glenn first disclosed to defendants

4    that she had been treated by Ms. Lackey and those records were

5    produced -- I believe it's six pages -- reflecting the PTSD

6    diagnosis.  There was, of course, follow-up relating to this.

7            Defendants were permitted to depose Ms. Glenn about

8    the treatment, and that was done on February 28.  They also

9    deposed her brother about the emotional distress.  And

10   Ms. Glenn at her deposition had a poor memory and was unsure of

11   when and how many times she had attended or received therapy.

12   And so defense counsel followed up with Ms. Glenn's attorney

13   about the possible need to issue a subpoena for records and

14   just to get clarity on the dates of treatment.

15           Next thing that happened on the timeline is April 1,

16   2024, a deadline for plaintiffs to serve expert disclosures.

17   On that date, they did provide a disclosure for Ms. Lackey as

18   an unretained expert under Rule 26(a)(2)(C).  The disclosure

19   indicated that Ms. Lackey would be testifying about her

20   clinical observations, diagnoses, and treatment of Ms. Glenn,

21   including the PTSD diagnosis that she suffers from as a result

22   of the wrongdoing at issue in the case.

23           Ten days later, on April 10, 2024, defendants issued

24   the Rule 35 notice for an IME.  The notice identified Kristen

25   Klipfel, Ph.D., as the examiner and asked Glenn to appear on

1    May 1, 2024, for "an interview and neuropsychological

2    testing/assessments ... for the purpose of determining the

3    nature and extent of injuries, if any, sustained by Clarissa

4    Glenn which are the subject of this action, and the

5    disabilities, if any, resulting therefrom."

6         Assuming the IME had happened on May 1, this would

7    have left 13 days for disclosure of Dr. Klipfel's opinions and

8    findings by the May 13 deadline for defendants' expert

9    disclosures.  The IME did not go forward on May 1.  Ms. Glenn

10   objected to the exam.  The parties then took till the end of

11   April to confer on issues surrounding the requested IME.

12        I heard about the dispute on April 30th in a joint

13   status report in which defendants provided their side of the

14   dispute and plaintiffs simply observed that Rule 35 says courts

15   may order exams only "on motion for good cause" and that

16   Ms. Glenn would respond to a motion when it was filed.

17        Defendants then filed that motion on May 8 asking not

18   only for the IME but for limited extension of the expert

19   discovery to complete it since they would be unable to do so by

20   May 13th.

21        Notably, during the meet-and-confer process before

22   that motion was filed, Ms. Glenn offered to withdraw Ms. Lackey

23   as an expert and to withdraw the Lackey medical records as

24   potential exhibits in the case provided that defendants agreed

25   to rescind the Rule 35 notice.

1    Defendants were unwilling to do so and so they filed

2    the pending motion.  And in the meantime, Ms. Lackey has been

3    deposed by defendants as permitted under the expert discovery

4    schedule.

5    I cannot force the parties to resolve a discovery

6    dispute on the terms that were -- they attempted to agree on,

7    with Ms. Lackey being withdrawn along with the records.

8    Defendants pointed out in their filings that even if Ms. Lackey

9    and her medical records were withdrawn, without a Rule 35 exam,

10   they would have no meaningful way to challenge Glenn's mental

11   health testimony on cross-examination at trial.

12   They gave the example that defendants could not argue

13   that Ms. Glenn never received treatment for her mental health

14   or related diagnoses, which is a typical argument for

15   demonstrating that emotional distress is not as severe as

16   alleged, and, if they did, Glenn could point to Lackey and her

17   medical records showing PTSD.  At that point defendants say

18   they would have no way to challenge the diagnosis and testing

19   methods Lackey used.  Glenn would then have the unfair

20   advantage to testify at trial as to her symptoms comprising

21   PTSD and her lack of emotional well-being without important

22   cross-examination on these subjects.

23   While all of this was also true before the offer to

24   withdraw Lackey and her records was made in April during the

25   meet-and-confer, it was only a month after the close of fact

1   discovery that Glenn's emotional distress damages claim began

2   to look more ominous.  Up until then, she was someone who had

3   never even sought treatment and did not have a diagnosis.  So

4   in my view, defendants cannot be faulted for not seeking an IME

5   back at that time, and they were not required to.

6          After Glenn finally disclosed in late January 2024 the

7   treatment and diagnosis from, you know, more than two years

8   earlier, June 2022, at that point defendants were entitled to

9   depose her about this significant new information, and they did

10  so at the end of February.  And then about a month later, on

11  April 1, the plaintiffs disclosed Ms. Lackey, and the notice

12  was sent within ten days.

13         Under these facts, I'm not persuaded that the April 10

14  Rule 35 notice of an exam to be conducted on May 1, 2024, was

15  untimely and should be denied.  Here I find there is good cause

16  both for the examination and for a limited extension of the

17  expert discovery deadline to complete that IME and disclose

18  Dr. Klipfel's findings and opinions.

19         I do want to say that given the compressed schedule

20  and all the other looming dates and the need, of course, for

21  plaintiff to depose Dr. Klipfel -- and I don't know if there

22  would be rebuttal.  I'll have to cross that bridge if we get to

23  it -- I am going to require plaintiffs to provide Ms. Glenn's

24  availability by close of business tomorrow unless there are

25  extenuating circumstances for why you cannot speak with her

1   before then.

2       And I'm going to allow Dr. Klipfel only two weeks from

3   the testing instead of three weeks as requested, in part -- and

4   I think when this notice was filed on April 10, if the IME had

5   proceeded on May 1, we would have been disclosing -- that is,

6   defendants would have been disclosing on May 13. But even

7   apart from that, there's just too much going on here, and this

8   would just delay everything too far. So I think it can and

9   should be done in two weeks after the exam is completed.

10       Let me turn briefly to the disputes over some of the

11   other aspects of the exam. Dr. Klipfel states she generally

12   conducts exams over two separate days to avoid fatigue. She

13   does it in three parts and usually asks for 16 hours. Here

14   defendant and Dr. Klipfel are agreeing to conduct the

15   examination in eight hours. I am going to allow eight hours.

16       Defendants note they have received only six pages of

17   mental health records with no indication that anyone performed

18   particular psychological testing -- or adequate psychological

19   testing and so they feel it is necessary for Dr. Klipfel to

20   have that time if she's going to offer opinions, and it will be

21   split over two days.

22       I'm rejecting plaintiffs' argument that the exam

23   should be significantly shortened since Dr. Klipfel could, for

24   example, watch Ms. Glenn's prior video depositions. Here eight

25   hours seems reasonable, and I don't think watching a video

1    deposition is a substitute for examining someone.

2           Plaintiffs also cited cases where exams of various

3    duration were allowed by courts.  But all of those decisions

4    are fact-dependent, so they're really not helpful to my

5    analysis here.

6           Ms. Glenn's opposition also questions the need for

7    certain tests.  For example, Dr. Klipfel has proposed possible

8    cognitive testing, and Ms. Glenn argues that her "mental acuity

9    is not at issue in this case, so there is no obvious reason"

10   for that testing.

11          Dr. Klipfel is an expert.  I am not going to play

12   doctor and tell her how to conduct her examination, what

13   specific tests are and are not necessary.  She has reduced the

14   time to eight hours, and I'm going to let her decide how to use

15   that time effectively to conduct the examination.

16          Finally, as to the scope of the exam, Ms. Glenn is

17   asking to limit questioning about the December 11, 2005, arrest

18   that is at issue in the case.  I decline to impose that

19   limitation.  Ms. Glenn is claiming that her severe emotional

20   distress, PTSD, and other mental health issues were caused by

21   the defendants' actions that day and the aftermath.

22   Dr. Klipfel has been retained to give opinions on that issue,

23   so I see no basis to declare questions about that arrest to be

24   off limits.

25          So that is my ruling.

1      Let me ask before I turn to the next motion whether

2  plaintiff or any of the defendants has questions about or need

3  for clarification on that ruling.

4          MR. BAZAREK:  Judge, William Bazarek.

5          Just real quick.  I do want -- I'll give a date right

6  now where Dr. Klipfel can examine Clarissa Glenn.  That would

7  be on June 17th, a week from today.  So she's available to

8  examine her.

9          And then, secondly, Judge, I thought I heard --

10         THE COURT:  Mr. Bazarek, let me --

11         MR. BAZAREK:  Yes.

12         THE COURT:  Sorry.  Let me ask -- let me interrupt

13  before you go to your next question.  She said she would do it

14  on two days.  So is she proposing June 17th and another date?

15         MR. BAZAREK:  Your Honor, I believe it was going to be

16  conducted -- I thought it was going to be conducted on one day.

17  Maybe my co-counsel -- Kelly?

18         MS. OLIVIER:  [Unintelligible.]

19         THE COURT:  All right.  Let me do this.  It's a very

20  bad connection, so I can't really hear you.  I'm going to have

21  the parties confer on that.  But we know Dr. Klipfel's

22  available on June 17th, and Ms. Glenn's counsel will get in

23  touch with her and get back to you tomorrow by close of

24  business, or as soon as they can, so we can get that scheduled.

25         Mr. Bazarek, go to your next question.

 1          MR. BAZAREK:  No, that was it.  Nothing else, your

 2   Honor.

 3          THE COURT:  All right.  And let me ask Ms. Glenn's

 4   counsel.  Anything you wanted to ask?

 5          MR. TEPFER:  Judge, only we will certainly talk to her

 6   today or tomorrow.  Just we did mention this during the

 7   hearing.  She has had physical surgery recently, so I'm not up

 8   to date on her.  So we will obviously get this done as soon as

 9   we can.

10          THE COURT:  Okay.  Thank you.

11          All right.  With that, I'm going to turn to the final

12   motion.  That is certain defendants' joint motion to allow

13   forensic examination and testing of Inventory No. 10503356.

14   That's Docket 279 filed in the Baker case, which is 16 C 8940.

15          I am denying that motion on the ground that it was not

16   timely.  Defendants have known since the lawsuit was filed in

17   2016 that plaintiff Ben Baker is alleging that the drugs that

18   defendants said were -- police officers said were taken from

19   him at the time of his arrest in March 2005 were planted.

20          They've also known since before the filing of the

21   lawsuit that the Baggies containing the drugs that the

22   arresting officers said were recovered from Mr. Baker at that

23   time in 2005 were never tested for fingerprints: one of those

24   plastic bags contained 110 clear plastic Baggies containing

25   heroin that reportedly were recovered from Baker's right hand,

1 and a second plastic bag contained 68 yellow-tinted Baggies

2 containing crack cocaine recovered from Baker's right-hand --

3 right front pants pocket.

4 Defendants have also known that Baker would make an

5 issue of the failure to run fingerprints 19 years ago when he

6 was arrested. Indeed, on April 28, 2023, Baker served requests

7 to admit that the City did not request the Illinois State

8 Police to conduct any analysis or testing to detect prints on

9 the narcotics or its packaging allegedly recovered from Baker

10 on March 23, 2005. They issued four similar requests to admit,

11 each going at this issue in a slightly different way.

12 The City's response was the same in response to each

13 of those. And it said -- I'm not going to read the full thing,

14 but "Subject to and without waiving the objections, upon

15 information and belief, the City admits that the Cook County

16 State's Attorney's Office and Baker and Baker's criminal

17 defense attorney and the Chicago Police Department did not

18 request that the Illinois State Police conduct fingerprint

19 analysis testing on the large Ziploc bag containing 110 smaller

20 Ziploc Baggies of heroin and large Ziploc bag containing

21 68 smaller Ziploc Baggies of cocaine recovered on March 23,

22 2025 [*sic*], and inventoried under Property No. 10503356 before

23 Ben Baker, who was represented by counsel, was convicted on

24 June 9, 2006, or thereafter."

25 And also an ISP witness was deposed and asked whether

1   in 2005 ISP was capable of running fingerprint testing and said
2   it was.

3           I'm told that defendants asked Baker at his deposition
4   whether he touched any of the bags and whether voluntarily or
5   involuntarily police held it up to his hand, and he said he did
6   not.  It surely was not a surprise to defendants that on
7   April 1, 2024, the plaintiffs disclosed an expert, Alicia
8   McCarthy, who gave a critical opinion of the officers, the
9   police, for not running prints back in 2005.  And she stated in
10  part -- and I'm looking at her April 1st, 2024, report.

11          She states, "From the review of documents listed, I
12  find no indication that attempts were made to recover friction
13  ridge details on the plastic bags and Baggies, nor from bundled
14  currency.  Such capabilities were readily available and
15  commonly used in many laboratories at the time of the 2005
16  laboratory examinations in this case."

17          And she describes and she also notes, "At the time of
18  the laboratory examinations in the Baker matter, it was common
19  practice in many agencies around the U.S. to process for latent
20  prints those bags and Baggies suspected of containing drugs,
21  especially in instances when the possession or handling of such
22  items by specific individuals was in question."

23          And then she notes that the documents "indicate that
24  ISP had the capabilities to process the above-listed evidence
25  in the Baker matter for the presence of latent prints," and the

1    deposition testimony of a technician confirmed that CPD was

2    aware that it was possible to test Baggies for latent prints

3    but said the department has never requested that such testing

4    be conducted.

5            And, finally, she reviewed a deposition of someone who

6    worked at ISP, Adrienne Hirsch, on September 7, 2023, who

7    confirmed that ISP had tested Baggies for fingerprints while

8    she was there, which, as I said, dated back to 2005.

9            And, secondly, on April 1, plaintiffs disclosed their

10   *Monell* expert, Jon Shane, and he included a footnote 75 on

11   page 96 of his report that criticized Chicago Police Department

12   since it "was aware of repeated allegations of fabrication of

13   evidence against the officers involved in Plaintiffs' arrests.

14   Knowing the complainants alleged that they had never handled

15   the evidence, a reasonable investigative measure would have

16   been to submit the evidence for forensic analysis (e.g.,

17   fingerprinting, DNA testing) to eliminate the complainant as an

18   offender.  If a complainant had handled the evidence,

19   particularly over a longer period (such as maintaining a

20   'stash' and peeling off smaller quantities from larger

21   quantities to serve customers), then forensic analysis may

22   confirm or dispel the investigator's suspicions.  This did not

23   occur."

24           One of the bases that defendants made for not deciding

25   to begin forensic testing until mid-April 2024 was that the

1   plaintiffs did not disclose these experts on these issues until

2   April 1, 2024.  The plaintiffs have now agreed to withdraw

3   expert McCarthy entirely since she was only offered for that

4   opinion, and they have agreed to not have Shane testify to the

5   opinion expressed at footnote 75 of the disclosure.

6          Because I am denying the defendants' motion,

7   plaintiffs will be barred from calling McCarthy to testify or

8   using her disclosure for any purpose and will be barred from

9   having Shane testify on the opinions expressed in footnote 75.

10         But to my surprise, defendants argue that they -- even

11  after the plaintiffs were prepared to withdraw both of those

12  experts, at least the opinions on this topic, defendants said

13  that they still needed this forensic testing, and they say that

14  if Baker's prints or DNA is on one or more of the bags, this

15  will provide further support that the defendant officers did

16  not fabricate reports that said the Baggies were recovered from

17  Baker on the day of his arrest.  They reason that this would

18  also mean Baker was not maliciously prosecuted and not

19  wrongfully convicted as he claims.

20         In light of the apparent importance that defendants

21  are giving to this fingerprint and DNA testing, even after

22  plaintiffs have agreed to withdraw the expert opinions

23  criticizing Chicago Police Department for not running or having

24  ISP run fingerprinting and DNA testing 19 years ago, it's

25  surprising to me that defendants waited until April 19 to even

1    begin the process of trying to get an order that would allow

2    defendants to conduct that testing in time to disclose any

3    opinions that were favorable by May 13, the disclosure

4    deadline.

5            The defendants' deadline to disclose expert opinions

6    was May 13.  To the extent plaintiff has any *Daubert* challenges

7    to those opinions, they're due by June 10th.  And as the

8    parties well know, the schedule is compressed due to the firm

9    trial date of January 8, 2025, in the Baker case.  Judge

10   Valderrama's order was entered on August 30th.  And after this,

11   the parties agreed on the compressed expert discovery schedule

12   that worked with Judge Valderrama's schedule for *Daubert* and

13   dispositive motions and the rest of his schedule.

14           So plaintiffs had to disclose experts by April 1 and

15   defendants by May 13, and this included time in the interim for

16   the depositions of plaintiffs' experts.  And so *Daubert*

17   motions, as I said, are due now June 10th.

18           If defendants felt it was important to do fingerprint

19   and DNA testing on the evidence from the March 2005 arrest of

20   Ben Baker -- that is the I guess 170 or so plastic Baggies or

21   some portion of them -- they should have -- they should not

22   have waited until Friday, April 19, to file the pending motion,

23   which asked for a hearing on the motion on April 23rd.

24           This was not a straightforward motion that merely

25   asked for an order allowing Chicago Police Department to

1   transfer evidence into the custody of the defendants' experts.

2   The motion sought entry of an order that included a provision

3   that Baker shall submit to Speckin Forensic to have his

4   fingerprints taken if CPD was able to provide them and that he

5   submit to a buccal swab to be taken by that company, if

6   necessary; that is, if they found DNA, then they were going to

7   want to compare it to his DNA from a buccal swab.

8        I understand it's not an invasive procedure to take a

9   buccal swab, but I would argue it is considered discovery that

10  should have been done during the fact discovery period.  But

11  even if it is expert discovery, for reasons I'm going to go

12  through, this simply was not filed in sufficient time to have

13  gotten a ruling on the motion and then conducted the testing

14  and disclosed everything by the May 13 deadline.

15       But, in addition, the motion sought an order that

16  would have ordered Sorenson Forensics to follow unspecified

17  "technical specifications" currently in place at that company

18  and allowed it to consume an item in order to obtain a result,

19  though no more than necessary.

20       I think anyone who has been involved in DNA testing

21  knows that there is a need for some prior discussion when this

22  type of testing is going to be done and often a need for a

23  court order to resolve disputes.  This isn't the type of motion

24  typically dealt with where you just file it and you get an

25  order the same day, and certainly no basis for me to deny

1    plaintiff an opportunity to oppose the motion and submit a

2    brief, which they did.

3            I did have a hearing on that motion, preliminary one,

4    shortly after it was filed.  That is, I had that hearing on

5    Wednesday, April 24, after the motion was filed on the Friday

6    before.  During that hearing, Mr. Noland said the parties could

7    not reach agreement and plaintiffs requested briefing.  He said

8    briefing was okay with the defendants, but the issue was the

9    May 13 discovery deadline and the fact that briefing would run

10   out the remainder of time that would otherwise be used to do

11   the work and send whatever was found to the lab.

12           Mr. Noland said the defendants wanted to make sure

13   that if briefing were allowed and the motion for forensic

14   testing were allowed that the defendants would have an

15   opportunity to do that testing.  Plaintiffs responded that the

16   request for testing was not timely and they would address that

17   in their briefing.

18           I said the parties would be briefing the timeliness

19   and that if I overruled on the timeliness, then defendants

20   would be allowed time to do the testing but needed to be

21   specific about the timetable.  I asked how much time it would

22   take given the multiple steps involved in this forensic testing

23   process as described in the order.

24           Mr. Noland said the goal in filing the motion was to

25   comply with the May 13 deadline, but he said the first step

1    involved processing of evidence and that could be done within a

2    week of any order that I entered, but he qualified that, saying

3    that he needed to talk to the expert.

4         Mr. Noland added that assuming something was found,

5    then he'd been told the next stage with Sorenson Lab could be

6    done on an expedited basis in two weeks or maybe three weeks.

7    Mr. Noland acknowledged that "It's sometimes out of our

8    control, but we told them of the May 13 deadline and our goal

9    was to get this done," that is, the fingerprint and DNA

10   testing.

11        Mr. Noland added that if the motion were granted,

12   defendants would likely be realistically asking for perhaps

13   more than three weeks and would report back to the Court on how

14   long it would take.  He asked to provide an update after the

15   motion was granted since he said the time estimates "may have

16   changed."

17        In the reply brief in support of the motion,

18   defendants said they wanted the Court to have a scheduling

19   hearing two or three days after granting the motion, at which

20   time defendants would then report on the timing issue to the

21   Court.  They said subject to that request for a scheduling

22   hearing, and to the extent it may be helpful to the Court's

23   ruling, it is estimated that defendants' experts could complete

24   the processing and examination of the inventory within 30 days

25   or less after the scheduling conference.

1    So to recap, the motion is filed on Friday, April 19.

2  I had my first hearing the following Wednesday, April 24.  Even

3  assuming it was a straightforward motion and I denied

4  plaintiffs' request to brief it and I simply, you know, ruled

5  on it right then and granted the motion allowing -- or ordering

6  Mr. Baker to give a buccal swab and allowing destructive

7  testing to be done per whatever testing procedure Sorenson had

8  in place, this left 19 days to complete the testing and

9  disclose the opinions.  That's not even three weeks.

10    And here I don't think it's -- I don't think a party

11  should expect or assume that when you file a motion like this

12  that it will be granted so quickly that you can get that kind

13  of testing done in that number of days.  So it wasn't

14  unreasonable for plaintiffs to ask to brief it.  There was a

15  good argument that it was not timely.  There were other

16  arguments that were not frivolous and a basis to argue that,

17  particularly demanding a buccal swab or fingerprints, if you

18  were going to need those, could be done at this stage.

19    And as I pointed out before, I think the motion did

20  not ask me to extend the May 13 deadline, though I said if I

21  found it was timely or overruled the argument that it was

22  untimely, I would allow additional time.

23    So because defendants aren't entitled to immediate

24  rulings on their motions, just because they delay in filing

25  them, now we're up against a tight deadline.  This motion was

1    not timely filed, and they knew their experts couldn't even

2    begin the testing until they filed a motion, a motion that

3    plaintiff was entitled to oppose.  And they needed to get a

4    court order so that the materials to be tested could be made

5    available to those experts and possibly with observation by

6    plaintiffs' expert to the extent any destructive testing was

7    going to be done for DNA.

8        So this motion and request to -- in addition, this

9    motion and request to start forensic testing was not made in a

10   vacuum.  The parties are still in the process of completing

11   lots of fact depositions that were allowed to happen after

12   December 18, 2023.  I previously granted defendants' motion for

13   more time to disclose a *Monell* expert over objection given the

14   volume of materials reviewed by that *Monell* expert and the

15   volume of his disclosure itself.

16       Based on earlier rulings today, the IME of Clarissa

17   Glenn is going forward and the deposition of Bryant Patrick.  I

18   have, in other words, exercised my discretion to grant

19   extensions when there is a reasonable basis and if it appeared

20   it would not cause huge problems with the schedule.

21       That is not so with this motion.  This motion was

22   foreseeable until plaintiffs had withdrawn the expert, the

23   impetus for seeking this testing.  And to the extent defendants

24   thought it was important evidence that would be necessary

25   regardless of whether plaintiffs decided on April 1 to disclose

1   an expert or not, they should have started that process much
2   sooner.

3           As in the *Smith v. City of Chicago* case that Judge
4   Guzmán and Judge Weisman handled that was plaintiffs -- or
5   sorry -- defendants relied on, there the motion was filed
6   almost a month before the close of fact discovery deadline, and
7   it still took a very long time to get everything done.  In
8   fact, it may not also be done now.  I don't know.  And there
9   was no trial date set in that case.

10          Here defendants said during the June 4th hearing that
11  they expected plaintiffs to do the testing.  But, of course, if
12  they'd -- if plaintiffs had planned to do the testing,
13  plaintiffs would have needed to file a motion like defendants
14  to get the inventory, the evidence, in the hands of their
15  experts in time to complete the testing and disclose opinions
16  by April 1.  So defendants must have realized, at least in
17  March 2023 when the plaintiffs' disclosure deadline was
18  April 1, that plaintiffs were not planning to run fingerprint
19  or DNA testing.

20          Defendants also argued that they could have gotten the
21  testing done by May 13 if only plaintiffs hadn't opposed the
22  motion, which they say plaintiffs should not have opposed.  I
23  disagree, as I've said, that plaintiffs weren't entitled to
24  oppose it or that defendants were entitled to a quick ruling so
25  that they could meet their deadline.  We have that luxury in

1    some cases; we don't have the luxury here.  And I think

2    everyone knew that these deadlines were tight.

3            My other concern is that the -- this would only be the

4    beginning.  The parties still have disputes as we speak about

5    the process and the destructive testing and the buccal swab.  I

6    haven't -- I would have to actually consider whether I would

7    order that to be provided.  And so we're not even in a position

8    that the testing could take place right now until those issues

9    were ruled on.

10           And, of course, plaintiff said during the June 4th

11   hearing that if this testing were to be allowed, plaintiffs

12   would want to do their own testing.  So, of course, there would

13   be a motion filed.  And maybe they would be entitled to do

14   that.  I don't know.  I would have to look at that.

15           So here I see no basis for granting this belated

16   motion to conduct the forensic testing.

17           As I said during the June 4 hearing, I did look

18   closely at the *Smith v. City of Chicago* case.  And I am not

19   ruling on the basis of the lack of chain of custody

20   information.  I don't think that bears on whether a party is

21   allowed to do testing during the discovery phase.

22           The problem here is that the testing had to be

23   completed in time for disclosures to be provided by May 13, and

24   so it was -- that motion on April 19 is not timely.

25           All right.  And then let me just take a quick look at

1    my notes.

2        All right.  I have covered everything I wanted to say.

3    So those are my reasons for exercising my discretion to deny

4    the motion.

5        Let me ask defendants if you have any questions or

6    need for clarification.

7        MR. NOLAND:  Just one thing I wanted to point out,

8    Judge.  This is Dan Noland.  Just for the record, the --

9    Mr. Baker I do not think was directly asked whether he ever

10   touched the Baggie.  Just a point of clarification for the

11   record.

12       THE COURT:  Oh, all right.  There was some discussion

13   of that in one of the briefs, but maybe it was just a

14   hypothetical that that was -- you didn't know what he would say

15   and so you didn't want to waste time testing during the fact

16   discovery phase because if he said, "Oh, yeah.  The police

17   forced the Baggies to my fingers," then I would -- there might

18   be no reason to bother testing the Baggies.  But I hear you.

19       So he was deposed, but he wasn't asked that.

20       Anything further from any counsel?

21   (No response.)

22       THE COURT:  Okay.  All right.  Thank you, everyone.

23   Have a good evening.

24       MULTIPLE COUNSEL:  Thank you, Judge.

25   (Concluded at 4:57 p.m.)

1                                    * * * * *

2           I certify that the foregoing is a correct transcript of the

3      record of proceedings in the above-entitled matter.

4

5      /s/ LAURA R. RENKE                              June 17, 2024
       LAURA R. RENKE, CSR, RDR, CRR
6      Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25